## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE:    THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| _____ : | |
| PRINTING TEXTILES, LLC DBA BERGER TEXTILES, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : **Court No. 23-00192** |
| | : |
| UNITED STATES, | : **PUBLIC DOCUMENT** |
| | : |
| Defendant, | : |
| | : |
| ECKER TEXTILES, LLC, | : |
| | : |
| Defendant-Intervenor. | : |
| _____ : | |

**BRIEF IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Kyl J. Kirby
**KYL J. KIRBY, ATTORNEY AND COUNSELOR AT LAW, P.C.**
1400 Lipscomb Street
Fort Worth, TX 76104
Tel: (214) 632-0841
_Counsel to Printing Textiles, LLC dba Berger Textiles_

Date: February 26, 2024

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

  I.   56.2 STATEMENT ................................................................................ 1

    A. Administrative Determinations Subject To Appeal .................................. 1

    B. Issues Of Law Presented ……………………………………................................ 1

  II.   STANDARD OF REVIEW ................................................................ 2

    A. Substantial Evidence Standard ……………………………...……………….. 2

    B. Arbitrary And Capricious Standard …………………………………………….. 3

  III.   STATEMENT OF FACTS ................................................................ 3

    A. Scope Of The Artist Canvas Order ……………………...……………………... 3

    B. Berger's CBM ………………………………………………………...… 4

    C. Procedural Background ……………………………………...……………..… 5

  IV.   SUMMARY OF ARGUMENT ……………………………………….……… 5

  V.   ARGUMENT .................................................................................... 6

    A. Legal Standard For Scope Determinations …………………………………...… 6

    B. Commerce Misapplied The Primary Criteria For Determining Scope Under 19 C.F.R. § 351.225 By Failing To Consider The 19 C.F.R. § 351.225(k)(1) And Thereby Expanding The Scope Of The Order ……………………………………. 7

    C. The Order and Commerce's Impermissibly Unlawful Interpretation Denied Berger Adequate Notice And Commerce Failed To Address Due Process Concerns Of Vague Language In The Scope Of The Order ………………………………….... 25

    D. Commerce's Plain Language And K(1) Factor Analysis Of Order Scope Language Is Unreasonable, Arbitrary, And Not Supported By Law ………………………. 28

  VI.   CONCLUSION AND RELIEF SOUGHT ............................................. 39

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Committee v. U.S.*, 515 F.3d 1372 (Fed. Cir. 2008) …..…. 13

*AK Steel Corp.* v. *United States,* 226 F.3d 1361 (Fed. Cir. 2000) …………………….. 10

*Allegheny Bradford Corp. v. United States*, 28 CIT 830, 342 F. Supp. 2d 1172 (2004) ………………………………………………………………………………………. 8, 27

*Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141 (2000) ……………….... 2

*ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012) ……………………………………………………………………….....… 6, 9, 11, 14

*Arnold P'ship v. Dudas*, 362 F.3d 1338 (Fed. Cir. 2004) …………………….…..……….. 3

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) …………………... 2

*Bell Supply Co. v United States*, 83 F.Supp. 3d 1311 (2015) …………………………... 7, 9

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012) …………………………………………………………………………… 26

*Diamond Sawblades Manufacturers' Coalition v. United States*, 405 F.Supp.3d 1345 (CIT. 2019) …………………………………………………………………..…….… 26

*Diversified Products Corp. v. United States*, 6 CIT 155, 161, 572 F. Supp. 883 (1983) ..... 2

*Duferco Steel, Inc. v. United States*, 25 CIT 493, 146 F.Supp.2d 913 (2001) ….…..… 11, 12

*Duferco Steel, Inc. v. United States,* 296 F.3d 1087 (Fed. Cir. 2002) ……………..... 7-9

*Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068 (Fed. Cir. 2001) …..….…..…… *8, 10*

*Ericsson GE Mobile Commc'ns, Inc. v. United States,* 60 F.3d 778 (Fed.Cir.1995) …. 7, 20

*FAG Italia Sp.A. v. United States,* 291 F.3d 806 (Fed. Cir. 2002) …………...…… 10

*Fedmet Res. Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014) ……………..... 9, 13-14

*Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281 (Fed. Cir. 2007) ……….…. 25

*Global Commodity Grp. LLC v. United States*, 709 F.3d 1134 (Fed. Cir. 2013) ….….…. 8

*Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ……. 25

*King Supply Co., LLC v. United States,* 674 F.3d 1343 (Fed.Cir.2012) ….……………. 8

*Meridian Prod. v. United States*, 890 F.3d 1272 (Fed. Cir. 2018) ………………..……. 6

*Mid Continent Nail Corp. v. United States*, 2012-1682, 2012-1683 (Fed. Cir. Jul 18, 2013) ……………………………………………………………………………………… 25

Mid Continent Nail Corp. v. United States, 725 F.3d 1295 (Fed. Cir. 2013) …... 7-8, 25-26

*Mid Continent Nail Corp. v. United States, 770 F.Supp.2d 1372 (Ct. Int'l Trade 2011)* …13

*Milecrest Corp. v. United States*, 264 F.Supp.3d 1353 (Ct. Int'l Trade 2017) …………... 25

*Mitsubishi Elec. Corp. v. United States,* 16 CIT 730, 802 F.Supp. 455 (1992) …………. 20

*Mitsubishi Polyester Film, Inc. v. United States*, 228 F. Supp. 3d 1359 (Ct. Int'l Trade 2017) …………………………………………………………………………..…. 9, 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ……… 3

*Nyeholt v. Sec'y of Veterans Affairs*, 298 F.3d 1350 (Fed. Cir. 2002) …………………... 25

*OMG, Inc. v. United States*, 972 F.3d 1358 (Fed. Cir. 2020) ………..………………….... 7

*Pac Fung Feather Co., Ltd. v. United States,* 19 CIT 1451, 911 F.Supp. 529 (1995), *aff'd,* 111 F.3d 114 (Fed.Cir.1997) ……………………………………………………….. 25

*Polites v. United States,* 755 F.Supp.2d 1352 (CIT 2011) ………………………………. 10

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351 (Fed. Cir. 2015) ……………………………………………………….……………………….... 6, 8

*Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 279 F.Supp.3d 1265 (CIT. 2017) ………………………………………………………………………………..… 10

*Smith Corona Corp. v. United States,* 915 F.2d 683 (Fed.Cir.1990) ………………….... 7

*Star Pipe Products v. United States*, 393 F.Supp.3d 1200 (CIT. 2019) …………...…….. 26

*Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2020) ……… 26

*Trade Assocs. Group v. United States*, 961 F. Supp. 2d 1306 (2014) …………………. 9, 24

*Universal Camera v. National Labor Relations Board, 340 U.S. 474 (1951)* …………..… 2

*USEC Inc. v. United States,* 34 Fed.Appx. 725 (Fed.Cir.2002) ……………….……… 13

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 102 S.Ct. 1186 (1982) … 26

*Viraj Group v. United States*, 476 F.3d 1349 (Fed.Cir.2007) …………………………… 13

*Walgreen Co. v. United States*, 620 F.3d 1350 (Fed. Cir. 2010) …………………….… 8

*Wheatland Tube C v. United States,* 161 F.3d 1365 (Fed. Cir. 1998) …………….…..… *8, 26*

*Whirlpool Corp. v. United States*, 144 F.Supp.3d 1296 (Ct. Int'l Trade 2016) ………….. 24

*Whirlpool Co. v. United States*, 890 F.3d 1302 (Fed. Cir. 2018) ………………………… 7

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ……………………………….……………………….. 2

**Administrative Determinations/Other Authorities**

2A N. Singer & S. Singer, Sutherland on Statutory Construction § 46.6 (7th ed. 2014) ….10

Acrylic Coated Polyester Camouflage Fabric https://rockywoods.com/products/acrylic-coated-polyester-camouflage-fabricrealtree-ap-grey ….…………………………………… 23

Acrylic-coated Cotton Fabric https://www.french-nc.com/shop/Fabrics/French-Fabrics/Acryliccoated-Cotton-Fabric.htm …………………………………………………… 22

Acrylic-coated / Wipe off https://lacigale-usa.com/productcategory/tablecloths/acrylic-coated/ ………………………………………………………………………...…… 23

CBP Antidumping and Countervailing Duties (AD/CVD) Update August/September 2016 https://www.cbp.gov/sites/default/files/assets/documents/2016-35Oct/Final%20August%20-%20September%202016%20ADCVD%20Update%2010042016.pdf ………………….. 35

Certain Softwood Lumber Products from Canada, 67 Fed.Reg. 36,070, 36,071 (May 22, 2002) ……………………………………………………………….………….. 31

Engineered Process Gas Turbo–Compressor Systems, Whether Assembled or Unassembled, and Whether Complete or Incomplete, from Japan, 62 Fed.Reg. 32,584 (June 16, 1997) ………………………………………………………………………... 31

Letter from Kyl J. Kirby, Kyl J. Kirby, Attorney and Counselor at Law, P.C., to the Secretary of Commerce re Application of Scope Ruling on Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China (December 15, 2022) ……… 4

Live Swine from Canada, 70 Fed.Reg. 12,181, 12,182 (Mar. 11, 2005) ……………….. 31

Marimekko Coated Cotton Fabrics https://www.finnstyle.com/mapvccofa.html .............. 23

Memorandum to James Maeder, Associate Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, from Erin Begnal, Director, Office III, AD/CVD Operations, regarding Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse (Aug. 15, 2023) …………………………………………………………………... 1

*Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31154 (June 1, 2006) ..................................................................... 1, 3

**Regulations/Rules**

19 C.F.R. § 351.225(k) ……………………………………………...………… 6, 8

19 C.F.R. § 351.225(k)(l) …………………………...………… 5-7, 9, 13, 24-25, 28, 38

19 C.F.R. § 351.225(k)(2) …………………………………………………....5, 7, 39

28 U.S.C. § 2412 …………………………………………...………………… 39

Plaintiff Printing Textiles, LLC dba Berger Textiles ("Berger") submits this Memorandum of Law in support of its Motion for Judgement on the Administrative Record pursuant to Rule 56.2 of the Rules of this Court.

## I.    RULE 56.2 STATEMENT

### A.    Administrative Determinations Subject To Appeal

Plaintiffs seek judicial review of the U.S. Department of Commerce's ("Commerce") final scope ruling finding that canvas banner matisse ("CBM") produced in, and exported from, the People's Republic of China ("China") and imported by Berger is within the scope of the antidumping ("ADD") order on certain artist canvas from China. *See Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31154 (June 1, 2006) (the "*Order*").

The challenged determination, findings, and conclusions are set out in Commerce's unpublished memorandum, See Memorandum to James Maeder, Associate Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, from Erin Begnal, Director, Office III, AD/CVD Operations, regarding Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse (Aug. 15, 2023), P.R.[1]23 ("*Scope Ruling*").

### B.    Issues Of Law Presented

1.   Issue One: Contrary to Commerce's decision, Commerce unlawfully expanded the scope of the *Order* and Commerce's scope interpretation exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence.

---

[1] Plaintiffs reference the Antidumping Public Record, **ECF No. 15-2**, as "**P.R.**", and the Antidumping Confidential Record as "**C.R.**", **ECF No. 15-3**.

2.  Issue Two: Contrary to Commerce's decision, the *Order* is void for vagueness and unconstitutional and Commerce's scope interpretation exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence.

3.  Issue Three: Commerce's *Scope Ruling* that Berger's CBM purchased from China is covered by the scope of the *Order*, based on the plain scope language and the (k)(1) factors, is unsupported by substantial evidence, arbitrary and capricious, and contrary to law.

## II.    STANDARD OF REVIEW

### A.  Substantial Evidence Standard

The Court holds unlawful any aspect of Commerce's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161, 572 F. Supp. 883, 888 (1983) (quoting 340 U.S. 474 (1951) [*Universal Camera v. National Labor Relations Board, 340 U.S. 474, 488 (1951)*]). Further, "Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (2000).

### B. Arbitrary And Capricious Standard

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted). An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are unsupported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors. *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004).

## III.   STATEMENT OF FACTS

### A. Scope Of The Artist Canvas Order

Commerce issued the *Order* on June 1, 2006. *See* 71 Fed. Reg. 31154. In the *Order*, Commerce defined the scope as follows:

> The products covered by this order are **artist canvases** regardless of dimension and/or size, whether assembled or unassembled, **that have been primed/coated**, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and **whether or not containing an ink receptive top coat**.
> **Priming/coating includes the application of a solution, designed to promote the adherence of artist materials**, such as paint or ink, to the fabric. Artist canvases (*i.e.*, pre–stretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placemats)

are tightly woven prepared painting and/or printing surfaces. Artist canvas and

stretcher strips (whether or not made of wood and whether or not assembled)

included within a kit or set are covered by this proceeding.

Artist canvases subject to this order are currently classifiable under subheadings

5901.90.20.00 and 5901.90.40.00 of the Harmonized Tariff Schedule of the United

States ("HTSUS"). Specifically excluded from the scope of this order are tracing

cloths, "paint–by–number" or "paint–it–yourself" artist canvases with a copyrighted

preprinted outline, pattern, or design, whether or not included in a painting set or

kit. Also excluded are stretcher strips, whether or not made from wood, so long as

they are not incorporated into artist canvases or sold as part of an artist canvas kit

or set. While the HTSUS subheadings are provided for convenience and customs

purposes, our written description of the scope of this proceeding is dispositive.

*Order*, 71 Fed. Reg. at 31155 (emphasis added).

**B.    Berger's CBM**

The Chinese-origin CBM of the scope ruling request is 600 denier 100% polyester

fabric woven (i.e., warp and weft) filament fiber, weighing approximately 270 GSM, that

has been coated with polyvinyl acetate / acrylate type polymers. One side of the fabric has

been coated and is visible to the naked eye. The coated side has hydrophobic sealing and

fireproof agents. The bottom priming/coating does not promote the adherence of artistic

materials. The fabrics are imported as rolls in various lengths with no designs. See Letter

from Kyl J. Kirby, Kyl J. Kirby, Attorney and Counselor at Law, P.C., to the Secretary of

Commerce re Application of Scope Ruling on Antidumping Duty Order on Certain Artist

Canvas from the People's Republic of China (December 15, 2022) ("*Scope Request*"),

P.R.1-3, C.R.1-3.

**C.     Procedural Background**

On December 15, 2022, Berger requested that Commerce determine whether

certain CBM, which Berger imports from China, are outside the scope of the *Order*, P.R.3,

C.R.1. Berger presented arguments to demonstrate that its CBM is outside the scope of the

*Order*, based on analysis of the factors listed under 19 C.F.R. § 351.225(k)(l) (analysis of

the plain language of the Orders and the descriptions contained in the petition and initial

investigations), as well as 19 C.F.R. § 351.225(k)(2) (analysis of the "*Diversified Products*

factors). On February 17, 2023, a purchaser of Petitioner, Tara Materials, Inc. ("Tara"),

assets (Ecker Textiles, LLC with U.S. production unproven) and supposed U.S. domestic

manufacturer (Charta Group, Inc. d/b/a Permalite, Inc. with U.S. production unproven)

filed comments, without submitting factual or document evidence, attempting to disprove

Berger's assertions that CBM's priming/coating does not promote the adherence of artistic

materials, P.R.4, P.R.5. On March 10, 2023, Berger responded to Ecker Textiles, LLC and

Charta Group, Inc. d/b/a Permalite, Inc., P.R.19, P.R.20, C.R.4. On August 15, 2023,

Commerce issued its *Scope Ruling* erroneously concluding the CBM is within the scope of

the Order on certain artist canvas from China without issuing any additional questions to

Plaintiff, P.R.24.

**IV.     SUMMARY OF ARGUMENT**

Berger asserts that Commerce unlawfully expanded the scope of the *Order*, that the

*Order* is void for vagueness and unconstitutional, and Berger's CBM falls outside the scope of

the *Order* (i.e., the product is expressly not covered by the plain language of the scope of the

order). The *Scope Ruling* is not otherwise supported by substantial evidence on the record

and/or is not in accordance with law.

## V.   ARGUMENT

### A.  Legal Standard For Scope Determinations

In determining the scope of an order, Commerce will consider:

> (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

> (2) When the above criteria are not dispositive, the Secretary will further consider:

> (i) The physical characteristics of the product;

> (ii) The expectations of the ultimate purchasers;

> (iii) The ultimate use of the product;

> (iv) The channels of trade in which the product is sold; and

> (v) The manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k). "[T]he plain language of an antidumping order is 'paramount' in

determining whether particular products are included within its scope" and, "[i]n

reviewing the plain language of a duty order, Commerce must consider the [ §

351.225(k)(1) factors]." *Meridian Prod. v. United States*, 890 F.3d 1272, 1277 (Fed. Cir.

2018). *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351,

1354 (Fed. Cir. 2015) (describing "a two-step process" in which "Commerce must [first]

consider the scope language contained in the order itself, the descriptions contained in

the petition, and how the scope was defined in the investigation and in the determinations

issued by Commerce and the ITC"); *ArcelorMittal Stainless Belg. N.V. v. United States*,

694 F.3d 82, 87 (Fed. Cir. 2012) ("[T]he first step in a scope ruling proceeding is to

determine whether the governing language is in fact ambiguous, and thus requires analysis of the regulatory factors [i.e., the (k)(1) sources] previously outlined. If it is not ambiguous, the plain meaning of the language governs."). "If the (k)(1) materials are not dispositive, Commerce then considers the (k)(2) criteria ....") (internal citations omitted). *OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020). "Scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (quoting *Duferco Steel, Inc. v. United States,* 296 F.3d 1087, 1089 (Fed. Cir. 2002)) Further, although Commerce has the authority to clarify an order's scope, it cannot interpret an order "in a way contrary to its terms," nor in a way "so as to change the scope of that order." *Whirlpool Co. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018) (internal citation omitted). In construing the language of the order, "Commerce cannot delegate to itself the power to expand the reach of an order through silence." *Bell Supply Co. v United States*,_CIT_, 83 F.Supp. 3d 1311, 1324 (2015). Stated another way, "Commerce cannot find authority in an order based on the theory that the order does not deny authority." *Duferco Steel*, 296 F.3d at 1096.

**B. Commerce Misapplied The Primary Criteria For Determining Scope Under 19 C.F.R. § 351.225 By Failing To Consider The 19 C.F.R. § 351.225(k)(1) And Thereby Expanding The Scope Of The *Order*.**

The language of an order dictates its scope. Commerce has broad authority "to interpret and clarify its antidumping duty orders." *Ericsson GE Mobile Commc'ns, Inc. v. United States,* 60 F.3d 778, 782 (Fed.Cir.1995) (citing *Smith Corona Corp. v. United States,* 915 F.2d 683, 686 (Fed.Cir.1990) ), *as corrected on reh'g* (Sept. 1, 1995). *See also*

*King Supply Co., LLC v. United States,* 674 F.3d 1343, 1349 (Fed.Cir.2012). " 'We therefore afford 'significant deference to Commerce's interpretation of a scope order,' so long as Commerce's interpretation is not 'contrary to the order's terms' and does not 'change the scope of the order.' " *Mid Continent*, 725 F.3d 1295 at 1300 (quoting *Global Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013)). *See also Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citing *Wheatland Tube C v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998)). Furthermore, "[s]cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel,* 296 F.3d at 1089. Although the petition and the investigation proceedings may aid in Commerce's interpretation of the final order, the order itself "reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order." *Id.* at 1096–97. Therefore, if Commerce conducts a scope ruling without reference to the language of an order it is not interpreting that order.

In interpreting the scope of the Orders, Commerce is limited to clarifying the scope based on the actual words of the Orders. See 19 C.F.R. § 351.225(k); *Duferco Steel,* 296 F.3d at 1097. "{A} scope determination is not in accordance with the law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms." *Allegheny Bradford Corp. v. United States*, 28 CIT 830, 842, 342 F. Supp. 2d 1172, 1193 (2004) (citing *Duferco Steel*, 296 F. 3d at 1094-95; *Eckstrom Indus.*, 254 F.3d at 1072; *Shenyang Yuanda*, 776 F.3d at 1344. The "cornerstone" of the Court's analysis "rest{s} on the language of the order." *Duferco Steel*, 296 F.3d at 1097; see also *Walgreen Co. v.*

*United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) (quoting *Duferco Steel*). "In a scope ruling proceeding, a predicate for the interpretive process is language in the order that is subject to interpretation." *ArcelorMittal Stainless*, 694 F.3d at 84 (citations and internal quotations omitted). In construing the language of the order, "Commerce cannot delegate to itself the power to expand the reach of an order through silence." *Bell Supply*, 83 F.Supp. at 1324. Stated another way, "Commerce cannot find authority in an order based on the theory that the order does not deny authority." *Duferco Steel*, 296 F.3d at 1096. Instead, "{s}cope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Id*. at 1089. Furthermore, the Court should avoid interpreting the language of the order to be "vague and open-ended," *Trade Assocs. Group v. United States*, 961 F. Supp. 2d 1306, 1318 (2014), because "Commerce's discretion to define and clarify the scope of an investigation is limited by concerns for transparency of administrative actions," *ArcelorMttal Stainless*, 694 F.3d at 90.

"Commerce should give consideration to petitioners' intended meaning when examining a petition's description of the subject merchandise. *See* [228 F.Supp.3d 1379] *Mid Continent Nail*, 770 F.Supp.2d at 1379 ("Commerce failed to address the Petitioners' Scope Letter which made clear the Petitioners' intention that their proposed scope language would include subject goods packaged with non-subject items. This failure alone renders the Final Scope Ruling unsupported by substantial evidence."); see also [*Fedmet Res. Corp. v. United States*, 755 F.3d 912, 921 (Fed. Cir. 2014)] ('[T]he reason why the (k)(1) sources are afforded primacy in the scope analysis is because interpretation of the language used in the orders must be based on the meaning given to that language during the

9

underlying investigations.')." *Mitsubishi Polyester Film, Inc. v. United States*, 228 F. Supp. 3d 1359, 1379 (Ct. Int'l Trade 2017).

It is well established that operative terms in such orders must be given effect as written, so that they are not rendered "mere surplusage." *See, e.g., Eckstrom Indus.,* 254 F.3d a t 1073 (Fed. Cir. 2001) (rejecting construction of antidumping order that rendered certain language "mere surplusage")' *AK Steel Corp.* v. *United States,* 226 F.3d 1361, 1370 (Fed. Cir. 2000) (same); *FAG Italia Sp.A. v. United States,* 291 F.3d 806 (Fed. Cir. 2002) ({w}e read statutes not in isolation but as a whole, settling on a construction that reduces terms to surplusage only where we can find no other reasonable reading of the statute") (internal citations omitted). "While Commerce has latitude in interpreting the ... Orders, it may not render parts of the Order 'mere surplasage." *Polites v. United States,* 755 F.Supp.2d 1352, 1357 (CIT 2011), *quoting Eckstrom Industries, supra,* 254 F.3d at 1073. *See also* 2A N. Singer & S. Singer, Sutherland on Statutory Construction § 46.6 (7th ed. 2014) (explaining that "{i}t is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute"; that "{c}ourts construe a statute to give effect to all its provisions, so that no part is inoperative or superfluous, void, or insignificant" ; and that "{c}ourts assume that every word, phrase, and clause ... is intended and has some meaning") (footnotes omitted)." *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 279 F.Supp.3d 1265, 1307-08 (CIT. 2017). *See Eckstrom Indus.,* 254 F.3d at 1073 (rejecting Commerce's interpretation of order covering "certain" stainless steel butt-weld pipe fittings within certain dimensions, where Commerce's interpretation

"essentially reduces to an interpretation of the Order as covering *any* stainless steel butt-weld pipe fittings" within those dimensions) (emphasis original).

The products covered by this order are ***artist canvases*** regardless of dimension and/or size, whether assembled or unassembled, ***that have been primed/coated***, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat. ***Priming/coating includes the application of a solution, designed to promote the adherence of artist materials***, such as paint or ink, to the fabric. Thus, when read in the entirety, the plain meaning and context of the reference "designed to promote the adherence of artist materials" in the scope language compels a narrow interpretation of the words "priming/coating". "[T]here can be no doubt that Commerce, on promulgating the Order, intended for the two sentences in question to serve as dispositive scope language. Commerce could not also have intended that these same two sentences would leave the scope of the Order as vague and open-ended as defendant's arguments would have the court presume. *See ArcelorMittal Stainless Belgium N.V. v. United States,* 694 F.3d 82, 90 (Fed.Cir.2012) ('Commerce's discretion to define and clarify the scope of an investigation is limited by concerns for transparency of administrative actions.'). *Trade Assocs.*, 961 F.Supp.2d at 1318.

*See ArcelorMittal Stainless*, 694 F.3d at 90 ("Commerce is not at liberty to ignore the plain terms of an order in what appears to be, in retrospect, an effort to better reflect the intent of the petitioners."); *Duferco Steel, Inc. v. United States*, 25 CIT 493, 501, 146 F.Supp.2d 913, 922 (2001) (noting that while "this Court has previously held that Commerce must give ample deference to the petitioner's intent when examining a petition's description of the subject merchandise," the Court should "avoid subjective issues of intent

11

and, instead, look to the petition's language to determine whether the class or kind of merchandise at issue was expressly included"), rev'd on other grounds, 296 F.3d 1087 (Fed. Cir. 2002). The *Order* states that "artist canvases" … "have been primed/coated" … "whether or not containing an ink receptive top coat" … and that the "[p]riming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." Interestingly in its Scope Ruling, Commerce stated that Berger's CBM is within the scope of the *Order* because the "CBM is a canvas roll and/or printable canvas that is primed/coated and is a woven ***prepared painting and/or printing surface*** … that the primed/coated side of the fabric ***is receptive to artist materials, consistent with our prior scope rulings*** … **,** P.R.23 (emphasis added). Clearly Commerce shifts the language away (unlawfully *expands* the Oder) from the language of the Order and that of the intent of the Tara. Commerce goes on to admit this shifting in the following:

> "the focus is notably on ***preparing the fabric 'to accept'*** paints or inks and on ***creating 'a surface for the graphic presentation of painted or printed images.'*** ", *Id.* at 16 (emphasis added).

> "Commerce has determined that priming/coating (*i.e.*, gessoing) ***a fabric to accept*** artist materials is "understood to be synonymous with the priming/coating material or the application thereof, which promotes the adherence of artist materials.", *Id.* at 17 (emphasis added).

> "Commerce further explained that gesso '***improves the receptivity of canvas*** to paint or other artistic materials, which helps clarify the scope's reference to priming or coating with a solution "designed to promote the adherence of artist materials.", *Id.* at 17 (emphasis added).

> "In the Impact Images PFCPU Scope Ruling, Commerce found the merchandise out of scope because "the polyurethane and flame retardants ***coating*** of PFCPU makes the product flame/heat, water, milder, and rot resistant, and ***is not applied to prime the product to be receptive to the application*** of paint or other artistic medium.' ", *Id.* at 17 (emphasis added).

> "Commerce further stated that because 'Impact Images provides sufficient information to demonstrate that no priming or coating is applied to PFCPU that ***increases the canvas' receptivity*** to paint, ink or other artistic materials (**i.e., any**

**graphics are applied to the canopy material regardless of coating**, and the coating applied to PFCPU is applied for non-graphical purposes), it is distinguishable from in-scope material that is ***necessarily primed/coated to allow for acceptance*** of artistic materials.' ", *Id*. at 17 (emphasis added).

"Therefore, the 19 CFR 351.225(k)(1) materials demonstrate that Commerce and the ITC have defined 'promote the adherence' of artist materials ***to mean 'allow for acceptance of,' 'improve{} the receptivity of canvas to,' or 'increase{} the canvas' receptivity to' artist materials***.", P.R.17 (emphasis added).

"we note that the ITC and our prior scope rulings have not interpreted '***adherence*** *so narrowly*. The ITC stated that '{a}rtists' canvas is a surface for the graphic presentation of painted or printed images. It is made from woven fabric that is primed and coated ('gessoed') *to accept* paints or inks and is sold in a variety of shapes, sizes, textures, and formats.' Although the ITC used primed/coated and 'gessoed' interchangeably, the focus is notably on ***preparing the fabric 'to accept' paints or inks*** and on ***creating 'a surface for the graphic presentation of painted or printed images***.' ", P.R.16 (emphasis added)

> Respectfully, Berger pointed out Commerce's ITC reliance flaws in the *Scope Request*, stating "Commerce unlawfully relied on a single sentence in the U.S. International Trade Commission's ("ITC") final publication in the Views of the Commission section to justify its scope creep. Like Commerce, the ITC too cannot expand the scope of an Order. The ITC only ' 'determines that a domestic industry will be harmed 'by reason of imports of that merchandise, or by reason of sales (or the likelihood of sales) of that merchandise for importation.' 19 U.S.C. § 1673 (emphasis added); *see also Viraj Group v. United States*, 476 F.3d 1349, 1351 (Fed.Cir.2007)." *Ad Hoc Shrimp Trade Action Committee v. U.S.*, 515 F.3d 1372, 1375 (Fed. Cir. 2008).", P.R.3 at 19, C.R.1 at 19. "[W]hile the ITC determines whether there is material injury or the threat of material injury, it is Commerce's investigation that defines the scope of the ITC's analysis." *USEC Inc. v. United States,* 34 Fed.Appx. 725, 730 (Fed.Cir.2002). In making its injury determination, the ITC can determine that certain merchandise subject to the investigation does not materially injure a domestic industry and should not be subject to antidumping or countervailing duties, but "the ITC has no independent authority to expand the scope of an ... investigation." *Ad Hoc Shrimp,* 515 F.3d at  1384.

"In light of ambiguous scope language, Commerce should give consideration to

petitioners' intended meaning when examining a petition's description of the subject

merchandise. *See* [*Mid Continent Nail Corp. v. United States*, 770 F.Supp.2d 1372, 1379

(Ct. Int'l Trade 2011)] ('Commerce failed to address the Petitioners' Scope Letter which made clear the Petitioners' intention that their proposed scope language would include subject goods packaged with non-subject items. This failure alone renders the Final Scope Ruling unsupported by substantial evidence."); see also *Fedmet*, 755 F.3d at 921 ('[T]he reason why the (k)(1) sources are afforded primacy in the scope analysis is because interpretation of the language used in the orders must be based on the meaning given to that language during the underlying investigations.'). *Mitsubishi Polyester*, 228 F. Supp. 3d at 1378.

Moreover, while Berger is thankful that Commerce stated the above, it also made unlawful interpretations in numerous and similar instances in previous ruling as pointed out in its *Scope Request*, P.R.3, C.R.1. Importantly, neither Tara, nor the agencies discussed the meaning of neither "promote" nor "adherence" as it pertains to the scope of the Order. According to Merriam-Webster's dictionary, promote means the below.

> 1       a: to advance in station, rank, or honor: RAISE
> b: to change (a pawn) into a piece in chess by moving to the eighth rank
> c: to advance (a student) from one grade to the next higher grade
>
> 2       a: to contribute to the growth or prosperity of: FURTHER
> promote international understanding
> b: to help bring (something, such as an enterprise) into being : LAUNCH
> c: to present (merchandise) for buyer acceptance through advertising, publicity, or discounting
>
> 3       slang: to get possession of by doubtful means or by ingenuity

According to Merriam-Webster's dictionary, "adherence" means "the act, action, or quality of adhering" and adhere is "to hold fast or stick by or as if by gluing, suction, grasping, or fusing". Antidumping duty orders "should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant

industry." *Fedmet*, 755 F.3d at 921 (quoting *ArcelorMittal*, 694 F.3d at 88). Accordingly, "[b]ecause the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage." *ArcelorMittal*, 694 F.3d at 88. According to no standardized tests are available to measure "adherence". According to third-party expert, Dr. Ray Work, there "no standardized tests are available to measure 'adherence' ", P.R.3 at 15, C.R. at 15.

In the *Impact Images* final ruling decision, Commerce began to expand the scope of the *Order* and added confusion (open-ended interpretation) to the "adherence" term by interchanging it with receptive/receptivity terms as physical characteristics. Commerce also introduced "allow for acceptance" to physical characteristics requirements. Below are the unlawful Commerce statements made in *Impact Images* (P.R.3 at 16, C.R.1 at 16):

> "Gesso is a coating which allows the canvas to be **receptive** to the application of paint or other materials." (emphasis added).

> "Impact Images asserts that the PFCPU product in question is therefore not covered by the scope of the *Order* because it is demonstrably not coated in gesso, or any other material which allows the canvas to be **receptive** to the application of paint or other materials, but, rather, coated with flame-retardant and polyurethane for the purpose of water/weather/fire-proofing and which does not aid in the application of any print medium." (emphasis added).

> "Moreover, the (k)(1) materials highlight the way in which "gesso" improves the **receptivity** of canvas to paint or other artistic materials, which helps clarify the scope's reference to priming or coating with a solution "designed to promote the adherence of artist materials." (emphasis added).

> "By contrast to "gesso," the polyurethane and flame retardants coating of PFCPU makes the product flame/heat, water, mildew, and rot resistant, and is not applied to prime the product to be **receptive** to the application of paint or other artistic medium." (emphasis added).

"Impact Images thus highlights, and we agree, that the language from the ITC reports and the *Tara – Print Canvas* scope ruling demonstrates that priming/coating (i.e., gessoing) is a requisite component of subject merchandise that allows it to accept artistic materials for a surface application (or a subsequent ink-**receptive** top coat, in the case of print canvas)." (emphasis added).

"Therefore, as Impact Images provides sufficient information to demonstrate that no priming or coating is applied to PFCPU that increases the canvas' **receptivity** to paint, ink or other artistic materials (i.e., any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes), it is distinguishable from in-scope material that is necessarily primed/coated to **allow for acceptance** of artistic materials." (emphasis added).

"In this way, the coating applied to PFCPU is demonstrated to have no specific bearing on the adherence/**reception** of artistic paint, ink, or other materials to the surface of the product (but, rather, applied for the sole purpose of imparted other, nonartistic qualities)." (emphasis added).

In the *Global Textile* final ruling decision, Commerce continued to expand the scope of the *Order* and caused confusion (open-ended interpretation) to the "adherence" term by interchanging it with receptive / receptivity terms and using the allow for acceptance language. Commerce yet again muddied the waters by bringing in "add application" as additional physical characteristics. Below are the unlawful Commerce statements made in *Global Textile* (P.R.3, at 17, C.R.1 at 17):

"Gesso is a coating which allows the canvas to be **receptive** to the application of paint or other materials." (emphasis added).

"Commerce thus found that Impact Images provided sufficient information to demonstrate that no priming or coating was applied to PFCPU that increased the canvas'
**receptivity** to paint, ink or other artistic materials (i.e., any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes), and it was distinguishable from in-scope material that was necessarily primed/coated to **allow for acceptance** of artistic materials." (emphasis added).

"The Tara Print Canvas Scope Ruling further establishes that subject print canvas necessarily contains a chemical coating which serves as a paint or ink-**receptive** primer." (emphasis added).

"Global Textile highlights, and we agree, that the Impact Images PFCPU Scope Ruling language (itself relying on the plain language of the scope, ITC reports, and the Tara Print Canvas Scope Ruling) establishes that priming/coating (i.e., gessoing) is a requisite component of subject merchandise that allows it to accept artistic materials for a surface application (or a subsequent ink-**receptive** top coat, in the case of print canvas)." (emphasis added).

"Therefore, as Global Textile provides sufficient information to demonstrate that no priming or coating is applied to blockout and backlit fabric that increases the canvas's **receptivity** to paint, ink or other artistic materials (i.e., any graphics are applied to the fabric regardless of coating, and the coating applied to both backlit and blockout fabric is applied for non-graphical purposes), such materials are distinguishable from in-scope material that is necessarily primed/coated to **allow for acceptance** of artistic materials." (emphasis added).

"Therefore, nothing on the record suggests that such coatings **aid application** of graphical media to the fabrics, nor contradicts Global Textile's statements that such coatings do not promote adherence of artist materials, such as paint or ink, to the blockout or backlit fabric." (emphasis added).

In the *Permalite* final ruling decision, Commerce yet again continued to expand the scope of the *Order* and caused confusion (open-ended interpretation) to the adherence term by interchanging it with receptive/receptivity terms and using the allow for acceptance language. Below are the unlawful Commerce statements made in *Permalite* (P.R.3, at 18, C.R.1 at 18):

"Gesso is a coating which allows the canvas to be **receptive** to the application of paint or other materials." (emphasis added).

"Commerce thus found that Impact Images provided sufficient information to demonstrate that no priming or coating was applied to PFCPU that increased the canvas'
**receptivity** to paint, ink or other artistic materials (i.e., any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes), and it was distinguishable from in-scope material that was necessarily primed/coated to **allow for acceptance** of artistic materials." (emphasis added).

"The Tara Print Canvas Scope Ruling further establishes that subject print canvas must necessarily contain a chemical coating which serves as a paint or ink-**receptive** primer." (emphasis added).

"Impact Images thus highlights, and we agree, that the language from the ITC reports and the Tara – Print Canvas scope ruling demonstrates that priming/coating (i.e., gessoing) is a requisite component of subject merchandise that allows it to accept artistic materials for a surface application (or a subsequent ink-**receptive** top coat, in the case of print canvas)."

"As we have found that a downstream coated canvas product on which artistic media may be applied which is fully manufactured in China was out of scope simply by virtue of not having an ink or paint **receptive** gesso/coating layer, it follows that an uncoated woven polyester input product is not subject to the scope of the order." (emphasis added).

In the *RV Print* final ruling decision, Commerce yet again continued to expand the scope of the *Order* with its greatest leap yet. Most, if not all of language the "Commerce's Position" is unlawful and further causing confusion (open-ended interpretation) to the absolute requirement that "Priming/coating includes the application of a solution, designed to **promote the adherence** of artist materials, such as paint or ink, to the fabric". Instead, Commerce focused on "canvas" wording / being canvas alone causing merchandise to be under the *Order*, a new nongraphical purpose requirement, and a new uniform surface requirement, all not listed in the *Order* or the *Order's* history. Below are the unlawful Commerce statements made in *RV Print* (P.R.3, at 19, C.R.1 at 19):

"The record evidence demonstrates that EVACPET is an artist canvas, as defined by the language of the scope. Specifically, EVACPET is primed/coated **for the purpose of converting a fabric into a canvas.**" The priming/coating "**is required to stiffen the fabric…giving it the stiffness properties of a canvas**" and "**provides whiteness and higher opacity to the translucent polyester fabric.**" … Moreover, RV Print **repeatedly refers to EVACPET as a canvas in its Scope Request**. We, therefore, find, based on the record evidence, that EVACPET is a canvas roll and/or printable canvas that is primed/coated and **is a prepared painting and/or printing surface**. Accordingly, we determine that the language of the scope of the *Order* demonstrates that EVACPET is subject to the *Order*." (emphasis added).

"Moreover, language from the ITC and our prior scope rulings have not interpreted "adherence" so narrowly. The ITC stated that "**{a}rtists' canvas is a surface for the graphic presentation of painted or printed images**. It is made from woven

18

fabric that is primed and coated ('gessoed') ***to accept*** **paints or inks and is sold in a variety of shapes, sizes, textures, and formats**." Although the ITC used primed/coated and "gessoed" interchangeably, the focus is notably on preparing the fabric "**to accept**" paints or inks and on creating "a surface for the graphic presentation of painted or printed images." In the Impact Images PFCPU Scope Ruling, we found the merchandise out of scope because "the polyurethane and flame retardants coating of PFCPU makes the product flame/heat, water, milder, and rot resistant, and is not applied to prime the product **to be receptive** to the application of paint or other artistic medium." Commerce further stated that "Impact Images provides sufficient information to demonstrate that no priming or coating is applied to PFCPU that **increases the canvas' receptivity to paint, ink or other artistic materials (*i.e.*, any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes)**, it is distinguishable from in-scope material that is necessarily primed/coated **to allow for acceptance of artistic materials**.' " (emphasis added).

"Here, by contrast, **RV Print has not demonstrated that its EVACPET coating is applied for nongraphical purposes or that it does not increase the canvas' receptivity to paint, ink, or other artistic materials**. … Notably, RV Print never defined the characteristics imparted by its EVACPET coating or **clarified whether it creates a uniform surface for the application of graphical media**. … Instead, record evidence suggests that RV Print's EVACPET coating is **for a graphical purpose and prepares the canvas to receive ink.** … Thus, we find that the record evidence suggests that the **EVACPET primer/coating's purpose is to prepare the canvas to receive ink printing**." (emphasis added).

"Moreover, RV Print repeatedly refers to EVACPET **as a canvas** in its Scope Request. The Tara Print Canvas Scope Ruling previously held that "printable canvases" are subject merchandise because they are specifically cited as an example of subject merchandise in the scope. Because the record evidence demonstrates that EVACPET is a **canvas roll and/or printing canvas**, both of which the scope cites as examples of subject merchandise, we find that EVACPET is in scope, in accordance with the Tara Print Canvas Scope Ruling." (emphasis added).

"The Impact Images PFCPU Scope Ruling and Global Textile's Blockout Fabric and Backlit Fabric Scope Ruling also affirm that **priming/coating a fabric to make it receptive to ink makes the fabric an artist canvas subject to the *Order***. Importantly, the requesting parties in the Impact Images PFCPU Scope Ruling and Global Textile's Blockout Fabric and Backlit Fabric Scope Ruling **demonstrated that the products in question were not primed/coated to accept, or be receptive to, artist materials**. Here, RV Print, as discussed above, does not demonstrate that EVACPET **is not primed/coated to accept, or be receptive to, artist materials**. Rather, the record contains evidence that EVACPET **is indeed primed/coated to accept, or be receptive to, artist materials**." (emphasis added).

19

"In Mitsubishi III, this Court held Commerce's 1991 scope ruling unlawfully expanded the coverage of the CMT Order by requiring importers to prove their CMT subassemblies were actually employed in the production of non-CMT devices in the United States to avoid having the subassemblies deemed "dedicated exclusively for use" in CMT transceivers or control units. [*Mitsubishi Elec. Corp. v. United States,* 16 CIT 730, 737-38, 802 F.Supp. 455, 461 (1992) (*Mitsubishi III*), *aff'd,* 11 F.3d 1070 (1993)]. The Court found no language in the CMT Order requiring such a showing and therefore held this new standard was not sustainable as a mere clarification of the CMT Order. *Id*. The CAFC affirmed." *Ericsson Ge Mobile*, 955 F.Supp. AT 1532.

It seems that Tara contributed to the scope creep with its own scope ruling in 2015. When describing the description of merchandise, Tara stated, "All artist Canvas is produced using raw canvas, which may be composed of cotton, cotton and polyester, 100% polyester or linen. **Bulk rolls of canvas are coated with a chemical compound, which serves as a paint or ink-receptive primer.** This chemical coating permits the canvas to better receive and hold paint or ink and prevent those materials from bleeding through to the other side. **Print canvas may be treated with an ink-receptive chemical topcoat**; this process was followed in 2005, when the petition was filed but, as a result of subsequent advances in canvas production technology and printer capabilities, not all print canvas undergoes such treatment." (P.R.3, at 21, C.R.1 at 21) (emphasis added). Here, Tara did not distinguish the acrylic latex "gesso" bottom "adherence" priming/coating from that of the ink receptive top coat as described in the *Order*.  In summarizing its argument, Tara went on to state that the *Order* "explicitly includes 'artist canvases . . . that have been primed/coated . . . whether or not containing an ink receptive top coat', states that the

reason for priming/coating is 'to promote the adherence of artist materials, such as paint or ink, to the fabric', identifies 'printable canvases' among the examples of Artist Canvas and notes that all the subject products 'are tightly woven prepared painting and/or printing surfaces.' " *Id*. Parsing out of the scope language likely caused confusion for Commerce in distinguishing between the acrylic latex "gesso" bottom "adherence" priming/coating from that of the ink receptive top coat as described in the *Order*. Tara then contradicted itself in stating that, "Print Canvas is identical in all respects to other Artist Canvas, **except for the additional priming with an ink-receptive topcoat** that some print canvas still undergoes, and is produced by the same process on the same machinery." *Id*. (emphasis added). Tara certainly added to the scope creep when it stated, "This language leaves no doubt or ambiguity about inclusion of Print Canvas, a product that has the features identified above: '**an ink receptive topcoat,' 'a solution, designed to promote the adherence of artist materials, such as . . . ink**, to the fabric' and 'tightly woven prepared . . . printing surfaces.' " *Id*. at 22. (emphasis added). Again, according to the history and the scope of the *Order*, there are two distinct coating types (bottom versus top) with distinct physical characteristics ("gesso" "adherence" versus "receptive"). Indeed, it is quite perplexing when Tara later stated that, "Print Canvas has the same physical characteristics as all other Artist Canvas. All Artist Canvas is composed of fabric with a chemical coating. Print Canvas may have an **additional topcoat**, **to permit reception of ink**, but otherwise is identical to other forms of Artist Canvas … There are a number of converters that purchase bulk rolls of chemically-coated canvas from domestic producers and undertake the final step of applying the **ink-receptive topcoat** themselves to produce Print Canvas." *Id*. (emphasis added). In its answer to Commerce's supplemental questionnaire, Tara seemed

to temporarily clear-up the distinction in stating, "Tara's scope request covers all print canvas, whether or not with an ink-receptive Topcoat, i.e., print canvas may be prepared in either configuration." *Id*. at 22. And again as outlined above, "The top coat, when used, is applied to canvas that already meets the definition of "artist canvas" because it previously has been coated with gesso." *Id*.

If Commerce expands the scope of the *Order* by basing its scope analysis on additional characteristics concerning the acrylic latex "gesso" bottom "adherence" priming/coating, then legitimately produced coated fabric products face the inevitable "scope creep." For these reasons, Commerce's scope analysis must begin and end with the plain language of the *Order*, which defines the physical characteristics of subject merchandise. It is very clear that Tara's "gesso" bottom "adherence" priming/coating solution concerns those "designed to promote the adherence of artist materials". In its efforts to avoid a nullity in the language of the *Order*, Commerce has instead unlawfully created totally new physical characteristic requirements in which every conceivable coated fabric is within the scope of the *Order* which has created absurd results. Importantly, the internet is replete with examples similar to Tara's acrylic coated fabric. Artist canvas antidumping duty would apply to the examples below if imported into the U.S. with absurd results. *See* Acrylic-coated Cotton Fabric (for table coverings and outdoor uses) https://www.french-nc.com/shop/Fabrics/French-Fabrics/Acryliccoated-Cotton-Fabric.htm (last visited February 26, 2024).



Acrylic Coated Abstract Circle on
Mustard Yellow Fabric #762

*See* Marimekko Coated Cotton Fabrics (for placemats, tablecloths, or anything kept outdoors) https://www.finnstyle.com/mapvccofa.html (last visited February 26, 2024).

See Acrylic-coated / Wipe off (for table cloths) https://lacigale-usa.com/product-category/tablecloths/acrylic-coated/ ((last visited February 26, 2024).



Marimekko Pieni Unikko White / Off
White Acrylic-Coated Cotton Fabric

See Acrylic Coated Polyester Camouflage Fabric (meant to be used outdoors for boat covers, blinds, ATV covers; anywhere you want a tough, water repellent camouflage

fabric)        https://rockywoods.com/products/acrylic-coated-polyester-camouflage-fabric-realtree-ap-grey (last visited February 26, 2024).



"[T]he court concludes that the Department's interpretation of the scope language is flawed for the reasons the court has identified, one of which is that, as so interpreted, the scope language becomes indefinite in a way that Commerce could not have intended." *Trade Assocs.,* 961 F.Supp.2d at 1317 (Ct. Int'l Trade 2014). This cannot have been Commerce's intent when drafting the *Order* or the intent of Tara. Commerce unlawfully expanded the scope of the *Order*. Commerce's unlawful interpretations render the language, priming/coating includes the application of a solution, designed to promote the adherence of artist materials, to mere surplusage. Commerce unlawfully ignored the intentions of Tara and other k(1) materials and thereby non not afford the sources primacy and instead have led to vague and open-ended interpretations. "Past rulings and reliance upon § 351.225(k)(1) cannot save a scope determination that is based on an unreasonable interpretation of the scope language." *Whirlpool Corp. v. United States*, 144 F.Supp.3d 1296, 1303 (Ct. Int'l Trade 2016). Commerce's consideration of Berger's *Scope Request* and determination that the scope contains language that includes, or "may

be reasonably interpreted to include" CBM is unlawful. Simply put, Commerce

unlawfully expanded the scope of the *Order* and Commerce's scope interpretation

exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence.

**C.    The Order and Commerce's Impermissibly Unlawful Interpretation Denied
        Berger Adequate Notice And Commerce Failed To Address Due Process
        Concerns Of Vague Language In The Scope Of The Order**

    "A law that purports to define the lawfulness or unlawfulness of conduct ' 'is void

for vagueness if its *prohibitions* are not clearly defined.' ' *Nyeholt v. Sec'y of Veterans*

*Affairs*, 298 F.3d 1350, 1356 (Fed. Cir. 2002) (quoting *Grayned v. City of Rockford*, 408

U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ). The void-for-vagueness doctrine

explains that a law that regulates conduct is arbitrary if it does not provide the public with

"a reasonable opportunity to know what is prohibited' and 'provide explicit standards for

those who apply them.' [*Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S.Ct.

2294, 33 L.Ed.2d 222 (1972)]." *Milecrest Corp. v. United States*, 264 F.Supp.3d 1353,

1374 (Ct. Int'l Trade 2017). "It is properly within the jurisdictional province of the court to

declare ultra vires and void, agency action that is beyond the scope of its defined statutory

authority." *Pac Fung Feather Co., Ltd. v. United States,* 19 CIT 1451, 1456, 911 F.Supp.

529 (1995), *aff'd,* 111 F.3d 114 (Fed.Cir.1997).

    "Commerce will provide 'adequate notice of what conduct is regulated by the

order.' See *Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1292 (Fed. Cir.

2007)". *Mid Continent Nail Corp. v. United States*, 2012-1682, 2012-1683, * 8 (Fed. Cir.

Jul 18, 2013). "The notice requirement reflects 'the broader due-process principle that

before an agency may enforce an order or regulation by means of a penalty or monetary

sanction, it must 'provide regulated parties fair warning of the conduct [the order or

regulation] prohibits or requires.' ' *Mid Continent*, 725 F.3d 1295, 1300–01 (Fed. Cir.

2013) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156, 132 S.Ct.
2156, 183 L.Ed.2d 153 (2012)) (alteration in original)." *Tai-Ao Aluminum (Taishan) Co. v.
United States*, 983 F.3d 487, 495 (Fed. Cir. 2020); *see also* id. at 1298 (Commerce must
write its orders with sufficient detail so as to provide "{ }adequate notice to regulated
parties") (citing 19 U.S.C. § 1673e(a)(2))." *Star Pipe Products v. United States*, 393
F.Supp.3d 1200, 1208 (CIT. 2019). Commerce's "rationale must not be arbitrary,
capricious, or an abuse of discretion. *Wheatland Tube Co. v. United States*, 161 F.3d 1365,
1369 (Fed. Cir. 1998)." *Diamond Sawblades Manufacturers' Coalition v. United States*,
405 F.Supp.3d 1345, 1351 (CIT. 2019). *See also Star Pipe*, 393 F.Supp.3d at 1208. "In
reviewing a business regulation for facial vagueness ... the principal inquiry is whether the
law affords fair warning of what is proscribed regulation for facial vagueness ... the
principal inquiry is whether the law affords fair warning of what is proscribed." *Village of
Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 102 S.Ct. 1186, 1194-95 (1982).

     "Our practice of deferring to an agency's interpretation of its own ambiguous
regulations undoubtedly has important advantages, but this practice also creates a risk that
agencies will promulgate vague and open-ended regulations that they can later interpret as
they see fit, thereby frustrat{ing} the notice and predictability purposes of rulemaking. It is
one thing to expect regulated parties to conform their conduct to an agency's interpretations
once the agency announces them; it is quite another to require regulated parties to divine
the agency's interpretations in advance or else be held liable when the agency announces
its interpretations for the first time in an enforcement proceeding and demands deference."
*Christopher,* 132 S.Ct. 2156 at 2167. *See also Mid Continent,* 725 F.3d at 1306.

This Court should reject Commerce's vague and open-ended interpretation of the *Order*. In *Allegheny Bradford Corp. v. United States,* this Court addressed a similar situation in a case involving stainless steel butt-weld pipe fittings. 28 CIT 830, 342 F. Supp. 2d 1172 (2004). The scope language stated that "{t}he edges of finished pipe fittings are beveled." *Id.* at 844, 342 F. Supp. 2d at 1184. Commerce claimed beveling is "not an essential physical characteristic for a product to fall within the scope of this order." *Id.* at 849, 342 F. Supp. 2d at 1189. The Court rejected Commerce's interpretation, explaining that "{t}o allow for unsubstantiated distinctions between a scope's 'requirements' and other, supposedly non-essential language is to invite arbitrariness and uncertainty into the process by which Commerce administers antidumping duty orders." *Id.* at 850, 342 F. Supp. 2d at 1190. The Court added that "Commerce's approach also constitutes an improper heightening of the standard faced by a plaintiff seeking to exclude its product." *Id.* at 851, 342 F. Supp. 2d at 1190. The Court thus disapproved of a "different, more exacting exclusionary standard" in which "Commerce uses a selective reading to nullify portions of an order's scope language which would otherwise exclude a plaintiffs product." *Id.*

As stated above, Commerce's interpretations of the *Order* raise serious due process concerns because such vague and open-ended language has caused absurd results in antidumping duties being imposed on importers without adequate notice. Respectfully, Berger requests Commerce to find that it unlawfully expanded the scope of the *Order* and the *Order* is void for vagueness and unconstitutional. Commerce's consideration of Berger's *Scope Request* and determination that the scope contains language that includes, or "may be reasonably interpreted to include" CBM is unlawful. Additionally, Commerce

unlawfully expanded the scope of the *Order* and Commerce's scope interpretation

exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence.

**D. Commerce's Plain Language And K(1) Factor Analysis Of *Order* Scope Language Is Unreasonable, Arbitrary, And Not Supported By Law**

In its Scope Request, Berger provided Commerce (k)(1) sources that clearly place

CBM outside the scope of the *Order* giving also the Tara's intention that is no way conflict

with the express language in the scope. But, it seems that Commerce's not so golden

silence shows that it did not consider the sources as required, P.R.23. As provided by

Berger, Tara stated that its "gesso" is a "***specific*** coating formula" with "compounds

utilized in making ***specialized latex paint***", P.R.3 at 24, C.R.1 at 24. (emphasis added).

Attached to its petition Tara further explained its acrylic latex gesso as "pigment (titanium

dioxide) and calcium carbonate mixed with acrylic polymer emulsion". *Id*. Importantly,

Tara stated, when compared to oil-based ground, that its long term, "***generations to come***"

gesso, ***resists yellowing***, ***preserves the canvas***, and has ***greater adhesion***. *Id*. (emphasis

added). *Id*. Indeed, concerning priming protection qualities, "All of our coatings are

specially formulated to ***complement and enhance the unique inherent characteristics of***

***the natural fibers as well as to protect the canvas fibers against acidic deterioration with***

***a buffered neutral PH sizing***." *Id*. (emphasis added).

In the 2006 public hearing, Tara stated, "In essence, it is a woven fabric primed or

***gessoed*** to accept paints and/or inks. You can't bake a cake with it, and you can't build a

house with it. It gets painted or printed on and transformed from artists' canvas into simply

art . . . The unique modification to these fabrics lies in the artists' coating or the gesso.

Once the gesso is applied, that fabric will now find its final home in some capacity as

artists' canvas . . . And finally, print canvas. This is artists' canvas that is intended for art

reproduction. It's critical to recognize that in order to manufacture print canvas the exact same fabric, gesso and manufacturing process is employed." *Id*. at 25 (emphasis added).

It its print canvas scope ruling, Tara described the merchandise as, "Print Canvas … manufactured in the ***same way***, using the same equipment and ***same materials***, as other forms of Artist Canvas." (emphasis added.) In its argument it went on to state, "Print Canvas is ***identical in all respects*** to other Artist Canvas, ***except for the additional priming with in ink receptive topcoat*** that some print canvas still undergoes, and is produced by the same process on the same machinery. (emphasis added.) Tara went on to point to Commerce's original language as listed above. " 'Made from woven fabric that is primed and coated ('***gessoed***') to accept paints or inks, it is sold in a variety of shapes, sizes, textures, and formats." At pg 6 referencing USTIC Pub. 3853, supra, at 3.' " (emphasis added). As of part of the scope ruling request, Commerce required additional information. As stated above, the following is an answer in the Tara Supplemental Response confirming that gesso is a requirement of artist canvas and in turn, print canvas. "The top coat, when used, is applied to canvas that ***already meets the definition of "artist canvas" because it previously has been coated with gesso***. Without top coat, products denominated as "print canvas" are identical to artist canvas for painting. There is no difference, and the same product can be used interchangeably for printing and painting." (emphasis added). In the same letter Tara stated that, "Tara Materials' gesso ***is*** composed of Latex, titanium dioxide (Ti02), calcium carbonate (CaCo3) and water. Tara Materials believes that ***all artist canvas gesso uses these materials***." (emphasis added). Compare Berger's CBM priming/coating that is made up of polyvinyl acetate / acrylate type polymers, completely different chemicals. Thus, scope of the *Order* entails covers artist

canvases … that have been primed/coated … whether or not containing an ink receptive top coat … [with a] [p]riming/coating [that] includes the application of a solution, designed to promote the adherence of artist materials. As Tara intended, and as the ITC and Commerce have recognized, it is unequivocally clear that Tara's specific acrylic latex "gesso" bottom "adherence" priming/coating formula is a prerequisite to artist canvas under the *Order*.

Instead of considering the k(1) facts as required, Commerce cherry picked materials and did not consider the regulatory history/record evidence. Commerce relied on a Berger submission stating that CBM is a "polyester fabric woven (*i.e.*, wrap and weft) filament fiber…that has been coated with polyvinyl acetate/acrylate type polymers.", P.R. 23 at 14. As explained in Berger's Scope Request, the CBM coating is manufactured differently, is of a different material than the Tara's coating, and CBM does not "promote the adherence of artist materials". Commerce relied on that CBM is primed/coated "for the purpose of converting a fabric into a canvas", *Id*. The express language of the *Order* clearly supports that being a canvas alone would not place CBM under the scope of the *Order*. Commerce relied on that CBM's priming/coating "is required to stiffen the fabric{,} giving it the stiffness properties of a canvas" and "provides whiteness and higher opacity to the translucent polyester fabric", *Id* at 15. As explained in Berger's *Scope Request*, these priming/coating characteristics do not "promote the adherence of artist materials" and would not be under the scope of the *Order* as such. Commerce goes on to heavily rely on "use" as a consideration. "Berger Textiles states that CBM enters the United States 'as rolls of coated fabric' and identifies several '{w}idely, publicly known uses,' including "canvas (art reproduction/stretching), roll-up display system, banner

product, display x-kite system, wall covering, décor applications, and tenting.'

Additionally, Berger Textiles markets CBM for use as 'canvas frames' and 'stretched

canvas.' In fact, Berger Textiles identifies CBM as the 'top-seller for' latex, UV, and

solvent ink application to canvas. While Berger Textiles contends that 'art reproduction' is

merely a marketing term, it fails to distinguish canvas used for art reproduction from artist

canvas. Additionally, Berger Textiles states that '{i}t is common sense that 'art

reproduction' can occur on' the coated side of the fabric.  Moreover, Berger Textiles fails to

distinguish CBM's other potential uses, including 'wall covering' and 'décor applications,'

from artist canvas." *Id*. Commerce seems to be confusing k(1) factors with the k(2) that it

did not reach as part of its supposed analysis. Clearly there is no "use" requirement

expressly stated in the scope. Importantly, "[e]nd-use restrictions in AD orders, while

appropriately utilized in certain cases, are disfavored because they can be difficult to

enforce. This is because the physical characteristics of an imported product are more

readily identifiable than the product's end use, which may be unclear at the time of

importation. Accordingly, when Commerce intends to impose end-use restrictions,

Commerce consistently uses express terms such as "only" or "solely" to indicate

restrictions on end uses for certain products. *See, e.g.*, Live Swine from Canada, 70

Fed.Reg. 12,181, 12,182 (Mar. 11, 2005) (Countervailing Duty Order) (excluding swine

"being used for breeding stock only"); Certain Softwood Lumber Products from Canada,

67 Fed.Reg. 36,070, 36,071 (May 22, 2002) (Countervailing Duty Order) (excluding

softwood lumber products that are "used solely" for certain single family home

construction); Engineered Process Gas Turbo–Compressor Systems, Whether Assembled

or Unassembled, and Whether Complete or Incomplete, from Japan, 62 Fed.Reg. 32,584

(June 16, 1997) (AD order) (covering "only those [turbocompressor systems] used in the petrochemical and fertilizer industries"). In its opinion, the Trade Court acknowledged that "Commerce has apparently described usage with more precision and specificity in other contexts when including or excluding products from the scope of an antidumping duty order." CIT Op. at *3, 2010 Ct. Int'l Trade LEXIS 112 at *8." *King Supply*, 674 F.3d 1343 at 1348. Commerce continued its missteps in relying on that "Berger Textiles repeatedly refers to CBM as a canvas in its Scope Request", *Id*. Nowhere in the scope language does it state that canvas alone would cause CBM to be under the scope of the *Order*. *See also* related arguments where Berger argues that Commerce unlawfully expanded the scope of the *Order*. Commerce also places reliance stating, "Berger Textiles states that CBM is sold to companies that print onto the canvas." In addition to the no end-use and k(2) arguments directly above, Berger has shown throughout its Scope Request that CBM's priming/coating does not "promote the adherence of artist materials". Commerce shows it own confusion relying on "the record evidence indicates that the primed/coated side of the fabric is receptive to artist materials, consistent with our prior scope rulings", *Id*. As discussed in more detail below, the scope of the Order does not concern a "primed/coated side of the fabric [that is] is receptive to artist materials" but rather if a priming/coating includes the application of a solution, designed to promote the adherence of artist materials. Berger has shown throughout its Scope Request that CBM's priming/coating does not "promote the adherence of artist materials". *See also* related arguments where Berger argues that Commerce unlawfully expanded the scope of the *Order* and that the *Order* is void for vagueness.

Where referring to end-uses, Commerce continues to argue that, "We note that, while Berger Textiles impugns CBM's ability to produce quality art reproduction, the product's quality does not determine whether it is subject to the *Order*.  Based on the above factors, we find that the record contains substantial evidence that Berger Textiles and the producer market CBM for use in art reproduction." *Id*. Commerce clearly confuses its "quality" finding with Berger's argument that its CBM coating is manufactured differently, is of a different material than the Tara's coating, and CBM does not "promote the adherence of artist materials".

Commerce found "that Berger Textiles has not distinguished its priming/coating solution from solutions that cause a fabric to become subject artist canvas." *Id*. at 16. Commerce again clearly did not consider k(1) facts properly where Berger clearly showed that its CBM is not under the scope of the *Order*. Commerce discarded Berger's CBM as chemically different (and that it does not consequently "promote the adherence of artist materials" as a result) while the Tara, as discussed herein, stated in the investigation and a follow up scope ruling that its "gesso" was a specific formula for the purpose of promoting the adherence of artistic materials. Commerce does gloss over "adherence" testing performed by Berger's third-party experts, Dr. Ray Work and 20 | 10 Labs, *Id*. However, Both experts found that CBM's priming/coating does not "promote the adherence of artist materials" as detailed in Berger's Scope Request, P.R.3 at 6, C.R.1 at 6. "Berger contracted Dr. Work and 20 | 10 Labs to perform 'adherence' testing. In all of the tests, Dr. Work found that the bottom priming/coating had the ***same or worse*** results when compared to the uncoated side. 86 (emphasis added) Dr. Work stated, '***All*** tests of the unprimed/uncoated side appeared to adhere better than or no different than the primed (coated) side.'

33

(emphasis added). 'In general, applications to the coated side *perform the same or worse than to the uncoated side concerning adherence*.' (emphasis added). The 'bottom priming/coating function' '*does not nor is it intended to provide adherence*, adhesion of the ink.' (emphasis added). 'My testing shows clearly that the *bottom priming/coating does not contribute to adherence*.' 'Coatings *do not promote the adherence* of ink jet inks.' Dr. Work plainly stated that CBM '*does not have greater adhesion*.' (emphasis added). Concerning dye sublimation transfer inks testing, '*No test showed the possibility of promoting the adherence* of the ink by the primer (bottom coating) and top coat of the primed (bottom coated) side versus the unprimed/uncoated side. … The primer (bottom coating) with top coat *is not designed to promote the 'adherence'* of ink or to accept the sublimation dye on transfer. … Per testing, adherence was worse 25% where applied to the coated side."93 (emphasis added). Concerning eco solvent pigmented inks testing, 'The adherence was the same or worse if primed (bottom coated) with top coat. … The primer (bottom coating) with top coat *is not designed to promote the 'adherence'* of ink. Ink can be applied to either side of the fabric. However, ink can be applied to either side of the fabric. Per testing, *adherence was worse 50% where applied to the coated side*.' (emphasis added). Concerning latex pigmented inks testing, 'The primer (bottom coating) with top coat *is not designed to promote the 'adherence'* of ink. However, ink can be applied to either side of the fabric. Per testing, *adherence was worse 75% where applied to the coated side*. (emphasis added). Concerning UV light curable pigmented inks testing, 'The *adherence appeared be the same whether or not coated*. The primer (bottom coating) with top coat *is not designed to promote the 'adherence' of ink and did not do so*. … Per testing, adherence is same (*does not promote*) where applied to the coated side."

34

Concerning water based pigment inks, 'the ***adherence is poorer not better on the coated side***. The primer (bottom coating) ***is not designed to promote the 'adherence'*** of ink and ***did not do so***. … Per testing, ***adherence was worse 75% where applied to the coated side***.'

20 | 10 Labs had similar findings in stating, 'This material showed poor adhesion when used for Latex printing on the uncoated side, and ***even worse adhesion performance on the coated side***. Sublimation transfer on the coated side exhibited adhesion performance under what is expected for a reasonable baseline on material suited for or tailored for this method. This, coupled with significant ink migration with transfer sublimation on the coating side, leads us to the logical conclusion that this material is ***best suited for printing via transfer sublimation to the***

***uncoated side of the material***'. (emphasis added)." *Id*. at 26

Interestingly Commerce asked for no sample of CBM and did not test whether the CBM's priming/coating "promote[s] the adherence of artist materials". It is worth noting that CBP, during its review process of the related entry, tested CBM but did not test whether it "promote[s] the adherence of artist materials", P.R.3 at 79, C.R.1 at 79. On May 9, 2019, CBP stated only that CBM is "The woven fabric is composed wholly of polyester and is coated on one surface with an acrylate type polymer. The sample is composed of 75% fabric and 25% coating (average of tow tests)." Apparently CBP had not resolved its testing shortcoming from its meeting with the Tara in 2016 where CBP discussed "Specific discussions between Tara lab chemists and CBP focused on testing procedures for determining country of origin." *See* CBP Antidumping and Countervailing Duties (AD/CVD) Update August/September 2016

https://www.cbp.gov/sites/default/files/assets/documents/2016-Oct/Final%20August%20-

%20September%202016%20ADCVD%20Update%2010042016.pdf (last visited February

26, 2024). While Berger tested physical characteristics with its experts and Commerce

does not recognize the testing and that no Chemical testing is available to test

priming/coating whether the priming/coating "promote[s] the adherence of artist materials"

then the *Order* is unenforceable and void for vagueness.

   In its justification, Commerce states that "the record contains evidence that CBM

has a priming/coating layer that increases the canvas' receptivity to artist materials.

Specifically, Berger Textiles submitted a patent for 'CBM technology,' which described

'a receiving medium comprising a substrate and an ink receiving layer.' The patent states

that an 'ink receptive coating' is 'applied to a substrate such as…canvas,' creating a

medium 'which yields a U.V. and water resistant ink jet print.' Although Berger Textiles

argues that the 'bottom priming/coating does not promote the adherence of artistic

materials,' there is no requirement in the scope that the priming/coating be located on a

specific portion of the artist canvas. Additionally, the patent indicates that the substrate

has only one priming/coating layer (*i.e.*, the ink receptive coating), notwithstanding

Berger Textile's assertion that there are two (*i.e.*, bottom and top) priming/coating

layers." P.R.23 at 17. Commerce is again simply incorrect in terms of interpreting the

scope language of the *Order* in terms of the Scope Request. The facts are consistent that

CBM's priming/coating does not "promote the adherence of artist materials" and does not

concern "receptivity". Berger has shown through its testing and third-party experts that

CBM has a priming/coating and a top coating, neither of which "promote[s] the

adherence of artist materials".

   It is evident that Commerce overreached its authority (and expanded the Order) by

relying on the following:

- "Berger Textiles has not demonstrated that the producer does not apply CBM's priming/coating layer **for graphical purposes** or that the priming/coating layer does not **increase the canvas' receptivity** to paint, ink, or other artistic materials", *Id*. at 17. (emphasis added).

- "whether CBM is primarily **used for the application** of print or artistic materials", *Id*. (emphasis added).

- "whether CBM's priming/coating layer **aids the receptivity** of latex, UV, and solvent inks", *Id*. (emphasis added).

- "The record, therefore, contains several instances in which Berger Textiles declines to affirmatively state that CBM lacks a priming/coating layer that **is applied for graphical purposes** and instead focuses exclusively on the adherence of the "bottom" priming/coating layer." *Id*. at 18. (emphasis added).

- "the distinction that Berger Textiles draws between 'bottom' and 'top' priming/coating is not supported by the record or the scope language", *Id*.

- "the expert report that Berger Textiles relies on to show that the bottom priming/coating does not promote adhesion assumes an overly narrow definition of adhesion, and is at times conflicting because the expert also concludes that the bottom priming/coating layer contributes 'slightly to absorption of ink,' which is an artist material identified in the scope." *Id*.
  - See the cherry-picked phrase in context of the entire expert comment of "The bottom priming/coating function is to stiffen the fabric and add opacity. It is a very thin layer and contributes only slightly to absorption of ink. It does not nor is it intended to provide adherence, adhesion of the ink. The fabric provides a smooth surface and it does not function to smooth the surface of 100% polyester fabric. On the other hand, for cotton and cotton/polyester blends, it can function to smooth the cotton fiber since the cotton is not uniform in thickness like polyester. Cotton and cotton/polyester canvas is regularly used as artistic canvas. 100% polyester canvas is commercial production canvas and is not suitable as artistic canvas. My testing shows clearly that the bottom priming/coating does not contribute to adherence." P.R.3 at 123, C.R.1 at 123.

- "Berger Textiles **fails to distinguish CBM's potential uses, including "art reproduction," "wall covering," and "décor applications," from artist canvas**." *Id*. at 18. (emphasis added).

- "Tara Print Canvas Scope Ruling determined that print canvases are specifically cited in the scope language as **an example of subject merchandise**." *Id*. (emphasis added).

- o  However, As discussed herein, the *Order* language expressly limits "artist canvas" to priming/coating "promote[s] the adherence of artist materials.

- "Berger Textiles imports CBM as rolls of coated fabric that it distributes to customers for such ***uses*** as canvas (***art reproduction/stretching***), roll-up display system, banner product, display x-kite system, wall covering, décor applications, tenting, and canvas frames." *Id.* at 18. (emphasis added).

- "As discussed above, Berger Textiles ***repeatedly refers to CBM as a canvas*** in its Scope Request." *Id.* (emphasis added).

- "In the Impact Images PFCPU Scope Ruling, Commerce found Impact Images provided sufficient information ***demonstrating that 'any image/graphic/coloring of the PFCPU*** is achieved primarily through a process of dye sublimation applied directly to the fabric, effectively dying the fibers of the fabric itself, ***and not through the application of a material to the surface of the fabric*.' " *Id.* at 19. *Id.* (emphasis added).

- "that the coating on the CBM has hydrophobic sealing and fireproof properties does not render the coating incapable of promoting the adherence of artist materials per se, and Berger Textiles ***does not provide evidence that such agents prevent promoting the adhesion of artist materials*." *Id.* (emphasis added).

Commerce abandoned the interpretive framework unlawfully ignored substantial evidence submitted by Tara from the original investigation, including the descriptions of the merchandise contained in the petition, the initial investigation, and the Commission's injury determinations that certain tempers were not subject to the underlying investigation. Commerce also unlawfully ignored substantial evidence submitted by Tara in its *Scope Ruling*. Commerce was required to address the (k)(1) factors and failure to address these factors renders the Scope Ruling unlawful, and the decision was unreasonable, arbitrary, capricious, and not supported by law with substantial evidence. Commerce's consideration of Berger's *Scope Request* and determination that the scope contains language that includes, or "may be reasonably interpreted to include" CBM is unlawful. Lastly, in its *Scope Request*, Berger demonstrated that the factors that Commerce is supposed to consider pursuant to the "(k)(2) factors" would cause Berger's CBM to be outside the

scope of the *Order*, P.R.3 at 40, C.R.1 at 40. In its *Scope Ruling*, Commerce did not examine any of the (k)(2) factors, P.R.23 at 14. Commerce's failure to examine the (k)(2) factors renders its *Scope Ruling* as unsupported by substantial evidence.

## VI.    CONCLUSION AND RELIEF SOUGHT

Wherefore, Plaintiff respectfully requests that the Court:

a.   enter judgment in its favor;

b.   declare with respect to the issues raised in this Complaint that the *Order* is void for vagueness and unconstitutional, that Commerce unlawfully expanded the scope of the *Order*, and Berger's coated fabrics fall outside the scope of the *Order* (i.e., the product is expressly not covered by the plain language of the scope of the order), and that the Scope Ruling is unsupported by substantial evidence and/or is otherwise not in accordance with law;

c.   remand this matter to Commerce with instructions to issue determinations that Plaintiff's CBM are excluded from the scope of the Order;

d.   Order CBP to refund Plaintiff any monies collected on its imports as a result of the *Order*;

e.   Award Plaintiff a judgment for costs, including reasonable attorney fees, in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f.   provide such other relief as the Court deems just and proper.

Respectfully Submitted,

/s/ Kyl J. Kirby
KYL J. KIRBY
Kyl J. Kirby, Attorney and
Counselor at Law, P.C.

1400 Lipscomb Street
Fort Worth, TX 76104
Tel: (214) 632-0841
*Counsel to Printing Textiles, LLC*
*dba Berger Textiles*

Date: February 26, 2024

## WORD COUNT CERTIFICATE OF COMPLIANCE

Pursuant to the U.S. Court of International Trade's Standard Chambers Procedures 2(B)(l), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Plaintiff Printing Textiles, LLC dba Berger Textiles Brief, as computed by KYL J. KIRBY, ATTORNEY AND COUNSELOR AT LAW, P.C.'s word processing system (Microsoft Word for 365), is 11,958 words.

Respectfully Submitted,

/s/ Kyl J. Kirby
KYL J. KIRBY
Kyl J. Kirby, Attorney and
Counselor at Law, P.C.
1400 Lipscomb Street
Fort Worth, TX 76104
Tel: (214) 632-0841
*Counsel to Printing Textiles, LLC
dba Berger Textiles*

Date: February 26, 2024