# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| PRINTING TEXTILES, LLC DBA BERGER TEXTILES, | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) Court No. 23-00192 |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| ECKER TEXTILES, LLC, | ) ) |
| Defendant-Intervenor. | ) ) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:
Joseph Grossman-Trawick
Attorney
U.S. Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement and Compliance
Washington, D.C.

CHRISTOPHER A. BERRIDGE
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-0537
E-mail: Christopher.Berridge@usdoj.gov

April 25, 2024

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGES**

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION
FOR JUDGMENT UPON THE AGENCY RECORD ................................................... 1

STATEMENT PURSUANT TO RULE 56.2 ............................................................... 2

    I.    The Administrative Determination Under Review ...................................... 2

    II.   Issues Presented For Review ................................................... 2

STATEMENT OF FACTS ........................................................................ 2

    I.    The Antidumping Duty Order ................................................. 2

    II.   Description Of Canvas Matisse Banner ..................................... 3

    III.   Scope Proceeding ............................................................ 3

SUMMARY OF THE ARGUMENT ............................................................... 4

ARGUMENT ................................................................................... 5

    I.    Standard Of Review .......................................................... 5

    II.   Legal Framework For Scope Rulings ....................................... 7

    III.  Commerce's Scope Determination Is Supported By Substantial
          Evidence And In Accordance With Law ..................................... 9

         A.  Commerce Properly Determined CBM Is Subject To The *Order*
            Based On The 19 C.F.R. § 351.225(k)(1) Sources ............................ 10

         B.  Commerce's Determination Not To Conduct An Analysis
            Under 19 C.F.R. § 351.225(k)(2) Is In Accordance With Law
            And Supported By Substantial Evidence ......................................... 21

    IV.  Commerce Did Not Unlawfully Expand The Scope Of The *Order* ........... 22

    V.   The *Order* Is Not Void-For-Vagueness, Did Not Deny Berger
          Adequate Notice, And Is Not Otherwise Unconstitutional ...................... 28

CONCLUSION ................................................................................. 32

# TABLE OF AUTHORITIES

**CASES**                                                           **PAGES**

*Am. Silicon Techs. v. United States,*
    261 F.3d. 1371 (Fed. Cir. 2001) ....................................................................6

*Adams Thermal Sys., Inc. v. United States,*
    279 F. Supp. 3d 1195 (Ct. Int'l Trade 2017) ........................................26, 31

*Allegheny Bradford Corp. v. United States,*
    342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) .............................................30

*ArcelorMittal Stainless Belg. N.V. v. United States,*
    694 F.3d 82 (Fed. Cir. 2012) ....................................................................31

*Axiom Res. Mgmt., Inc. v. United States,*
    564 F.3d 1374 Fed. Cir. 2009) ...................................................................26

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ....................................................................................6

*Consolo v. Fed. Maritime Comm'n,*
    383 U.S. 607 (1996) ..................................................................................21

*Corus Staal BV v. Dep't of Commerce,*
    395 F.3d 1343 (Fed. Cir. 2005) ...................................................................5

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ..............................................................................7, 30

*Crawfish Processors Alliance v. United States,*
    483 F.3d 1358 (Fed. Cir. 2007) ...................................................................6

*Duferco Steel, Inc. v. United States,*
    296 F.3d 1087 (Fed. Cir. 2002) ............................................ 7, 22, 27, 30

*Eckstrom Indus., Inc. v. United States,*
    254 F.3d 1068 (Fed. Cir. 2001) .............................................................7, 27

*Ericsson GE Mobile Communications, Inc. v. United States,*
    60 F.3d 778 (Fed. Cir. 1995) .......................................................................7

*Fedmet Resources Corp. v. United States,*
    755 F.3d 912 (Fed. Cir. 2014) .................................................................6, 9

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d. 1034 (Fed. Cir. 1996) ....................................................................6

*Global Commodity Group LLC v. United States,*
    709 F.3d 1134 (Fed. Cir. 2013) .......................................................6

*Goldlink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)................................6

*King Supply Co. LLC v. United States,*
    674 F.3d 1343 (Fed. Cir. 2012) ...................................................6

*Mid Continent Nail Corp. v. United States,*
    725 F.3d 1295 (Fed. Cir. 2013) .........................6, 7, 21, 29, 30, 31

*Meridian Prod., LLC v. United States,*
    851 F.3d 1375 (Fed. Cir. 2017) ...............................................7, 9

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) .................................................21

*Sandvik Steel Co. v. United States,*
    164 F.3d 596 (Fed. Cir. 1998) .....................................................6

*Sango Int'l L.P. v. United States,*
    484 F.3d 1371 (Fed. Cir. 2007) ...............................................5, 8

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States,*
    776 F.3d 1351 (Fed. Cir. 2015) .........................................7, 8, 22

*Tai-Ao Aluminum (Taishan) Co. v. United States,*
    983 F.3d 487 (Fed. Cir. 2020) ...................................................31

*Tak Fat Trading Co. v. United States,*
    396 F.3d 1378 (Fed. Cir. 2005) ...................................................8

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951).....................................................................6

*United Steel & Fasteners, Inc. v. United States,*
    6947 F.3d 794 (Fed. Cir. 2020) ...................................................9

*Walgreen Co. of Deerfield v. United States,*
    620 F.3d 1350 (Fed. Cir. 2010) ...................................................6

*Wheatland Tube Co. v. United States,*
    161 F.3d 1365 (Fed. Cir. 1998) ...................................................7

*Whirlpool Corp. v. United States,*
    144 F. Supp. 3d 1296 (Ct. Int'l Trade 2016).............................25

## STATUTES

19 U.S.C. § 1516a(a)(2)(B)(vi)....................................................................5

19 U.S.C. § 1561a(b)(1)(B) .........................................................................5

19 U.S.C. § 1673e(a)(2) ...............................................................................7

## REGULATIONS

19 C.F.R. § 351.225 ............................................................... 5, 7, 22, 28

19 C.F.R. § 351.225(a) ................................................................................7

19 C.F.R. § 351.225(c) ................................................................................3

19 C.F.R. § 351.225(e) ................................................................................8

19 C.F.R. § 351.225(d)(1)(ii) ......................................................................3

19 C.F.R. § 351.225(k)(1) ...................................................................*passim*

19 C.F.R. § 351.225(k)(2) ...................................................................*passim*

## RULES

Rule 56.2 of the United States Court of International Trade..................................1, 2

## ADMINISTRATIVE DETERMINATIONS

*Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China,*
71 Fed. Reg. 31,154 (Dep't of Commerce June 1, 2006).........................................*passim*

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing
Duty Laws,* 86 Fed. Reg. 52,300 (Dep't of Commerce Sept. 20, 2021) .............................8, 23

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

|  |  |  |
|---|---|---|
| PRINTING TEXTILES, LLC d/b/a BERGER TEXTILES, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 23-00192 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| ECKER TEXTILES, LLC, | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record (Pl. Br., ECF No. 19) filed by plaintiff, Printing Textiles d/b/a Berger Textiles (Berger). Berger challenges the Department of Commerce's (Commerce) final scope ruling finding that the canvas banner matisse (CBM) imported by Berger is within the scope of the antidumping duty (AD) order, and further challenges the AD order itself. As demonstrated below, Commerce's scope ruling is supported by substantial evidence and otherwise in accordance with law, and the AD order provided sufficient clarity and due process to importers. Accordingly, Commerce's scope ruling should be sustained.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.    <u>The Administrative Determination Under Review</u>**

Berger challenges the final scope ruling issued on August 15, 2023, concerning the AD order on certain artist canvas from China.  *See Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse* (August 15, 2023) (Final Scope Ruling) (P.R. 23).[1]

**II.    <u>Issues Presented For Review</u>**

1.   Whether Commerce's determination that CBM is subject to the antidumping duty order is supported by substantial evidence and is otherwise in accordance with law.

2.   Whether Commerce unlawfully expanded the scope of the antidumping duty order through its interpretation of the 19 C.F.R. § 351.225(k)(1) sources.

3.   Whether the antidumping duty order is void-for-vagueness, denies parties adequate notice, or is otherwise unconstitutional.

<u>**STATEMENT OF FACTS**</u>

**I.    <u>The Antidumping Duty Order</u>**

On June 1, 2006, Commerce promulgated the *Order* at issue in this case.  *Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31,154 (Dep't of Commerce June 1, 2006) (the *Order*).  Commerce defined the scope of the *Order*, in relevant part, as follows:

> The products covered by the Order are artist canvases regardless of dimension and/or size, whether assembled or unassembled, *that have been primed/coated*, whether or not made from cotton, whether or not archival,

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying administrative review.  Administrative Record Index, ECF No. 15.  This brief does not contain any confidential information.

whether bleached or unbleached, and whether or not containing an ink receptive top coat.

*Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric. Artist canvases (i.e., pre-stretched canvases, canvas panels, canvas pads, canvas rolls* (including *bulk rolls* that have been primed), *printable canvases*, floor cloths, and placemats) *are tightly woven prepared painting and/or printing surfaces*.

*Id.* (emphasis added).

## II.     Description Of Canvas Matisse Banner

The product covered by Commerce's scope ruling is CBM, which is 600 denier 100 percent polyester fabric woven filament fiber that is coated on one side with polyvinyl acetate/acrylic-type polymers.  Final Scope Ruling at 3.  CBM fabric has a coating visible to the naked eye which contains hydrophobic sealing and fireproof agents.  *Id.*  CBM is packaged as rolls of coated fabric of various lengths which Berger distributes to its customers.  *Id.*  Berger explained that there are "several uses of CBM, including as canvas (art reproduction/stretched), wall covering, and décor applications."  *Id.* at 4.  (citing Berger's Scope Ruling Application).

## III.     Scope Proceeding

On December 15, 2022, Berger filed a scope ruling application pursuant to 19 C.F.R. § 351.225(c) requesting that Commerce determine that CBM is not covered by the scope of the *Order*.  Berger Textiles' Letter, "Application of Scope Ruling on Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China" (Dec. 15, 2022) (P.R. 1-3, C.R. 1-3) (Scope Ruling Application).

On January 19, 2023, Commerce notified interested parties that the scope inquiry was deemed initiated pursuant to 19 C.F.R. § 351.225(d)(1)(ii) on January 18, 2023.  *See*

Commerce's Letter, "Scope Inquiry of Certain Coated Fabrics from the People's Republic of China:  Deemed Initiation of Scope Inquiry" (January 19, 2023) (P.R. 9).

On February 17, 2023, Charta Group, Inc. d/b/a Permalite, Inc. (Permalite) and Ecker Textiles, LLC (Ecker), submitted comments arguing that CBM is within the scope of the *Order*. *See* Permalite's Letter, "Comments of Charta Group, Inc. d/b/a Permalite, Inc. regarding the Application of Printing Textiles, LLC, d/b/a Berger Textiles for Scope Ruling on Antidumping Duty Order in Certain Artists' Canvas from the People's Republic of China," (February 17, 2023) (P.R. 13); Ecker's Letter, "Ecker Textiles, LLC's Comments Regarding Berger Textiles Scope Inquiry," (February 17, 2023) (P.R. 14).  On March 10, 2023, Berger submitted comments in response to those submitted by Ecker and Permalite.  *See* Berger's Letters, "Response to Comments," (March 10, 2023) (P.R. 19), "Response to Comments," (March 10, 2023) (P.R. 20).

In its final scope ruling on August 16, 2023, Commerce considered the scope language coupled with interpretive sources under 19 C.F.R. § 351.225(k)(1), including a prior International Trade Commission (ITC) determination and Commerce's prior scope rulings pertaining to the *Order*, and determined that CBM imported by Berger was indeed covered by the scope of the *Order*.  *See* Final Scope Ruling at 14-20.  Because these (k)(1) sources were dispositive in determining that CBM is covered by the scope of the *Order*, Commerce found it unnecessary to consider the additional factors specified in 19 C.F.R. § 351.225(k)(2).  *Id*. at 14.

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's final scope ruling because it is in accordance with the law and supported by substantial record evidence.  Commerce's regulations provide it with the discretion to use the interpretive sources under 19 C.F.R. § 351.225(k)(1) in its initial analysis of an order's scope language.  Consistent with the regulations, Commerce was entitled

to rely on the (k)(1) sources such as prior scope rulings, the ITC Final Report, and the language of the *Order*, to determine that CBM is within the scope. Contrary to Berger's arguments, Commerce reasonably interpreted the *Order* using (k)(1) sources and thus acted in accordance with the law when it did not consider 19 C.F.R. § 351.225(k)(2) sources.

Additionally, Commerce's interpretation of the scope language did not unlawfully expand the scope of the *Order*. Commerce properly considered the record evidence under 19 C.F.R. § 351.225(k)(1) and did not interpret the scope of the *Order* contrary to its language nor in a manner that changed the scope of the *Order*. Rather, Commerce plainly interpreted the scope language and its interpretation is consistent with prior scope rulings and the ITC Final Report.

Finally, the *Order* itself is not impermissibly vague, nor does it otherwise raise due process concerns. The scope language sets out what merchandise is subject to the *Order*. Berger further fails to articulate how the *Order* is unconstitutional, and thus does not meet its burden in showing that it was somehow deprived of due process. For these reasons, Commerce's scope ruling should be sustained, and Berger's motion should be denied.

## ARGUMENT

### I.    Standard Of Review

The Court may review a determination by Commerce as to "whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi). Such a "class or kind" determination is known as a "scope ruling." 19 C.F.R. § 351.225. In reviewing Commerce's scope determinations, the court "must uphold a scope ruling unless [it finds the ruling] to be 'unsupported by substantial evidence on the record, or otherwise not in accordance

with law.'" *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1378 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1346 (Fed. Cir. 2005). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) ("[s]ubstantial evidence is more than a mere scintilla").

But "[e]ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1044 (Fed. Cir. 1996)). "[T]he Court may not substitute its judgment for that of the [agency] when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal quotations omitted).

In undertaking its analysis, the Court grants "'significant deference to Commerce's interpretation of a scope order,' so long as Commerce's interpretation is not 'contrary to the order's terms,' and does not 'change the scope of the order.'" *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (quoting *Global Commodity Group LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013)). This is because scope rulings involve "'a highly fact intensive and case-specific determination.'" *Fedmet Resources Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014) (quoting *King Supply Co. LLC v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012)). Thus, scope rulings are "particularly within the expertise of

[Commerce]." *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998); *see also Walgreen Co. of Deerfield v. United States*, 620 F.3d 1350, 1355 (Fed. Cir. 2010).

Commerce also "enjoys substantial freedom to interpret and clarify its antidumping duty orders." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1094-95 (Fed. Cir. 2002) (quoting *Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995)). "However, Commerce cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citing *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998)). Ultimately, the Court grants Commerce substantial deference in interpreting its own orders, provided the orders "contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *See Duferco Steel*, 296 F.3d at 1094-95.

Finally, Commerce's scope rulings must "reflect broader due-process principle[s]" and not deprive parties of "fair warning of the conduct [the order or regulation] prohibits or requires." *Mid Continent*, 725 F.3d at 1300-01 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012)).

## II.    Legal Framework For Scope Rulings

When Commerce publishes an AD or countervailing duty (CVD) order, it defines the scope and "includes a description of the subject merchandise, in such detail as [Commerce] deems necessary." 19 U.S.C. § 1673e(a)(2). Commerce is often called upon to determine whether a certain product is included within the scope of an AD or CVD order because it must write scope language in general terms. 19 C.F.R. § 351.225(a); *see also Meridian Prod., LLC v. United States*, 851 F.3d 1375, 1379 (Fed. Cir. 2017). When Commerce confronts such a

question, it follows the analytical framework and procedures set forth in its regulations. 19 C.F.R. § 351.225; *see also Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015) ("There is no specific statutory provision governing the interpretation of the scope of [AD] or [CVD] orders.").

In 2021, Commerce amended its regulation for answering scope questions. *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 Fed. Reg. 52,300, 52,322-23 (Dep't of Commerce Sept. 20, 2021); 19 C.F.R. § 351.225(k) (2022). Pursuant to the amended regulation, to determine if a product is covered by the scope of an order, Commerce "*may* make its determination" on the basis of the language of the scope alone. 19 C.F.R. § 351.225(k)(1) (emphasis added). However, in making this determination, Commerce has discretion to consider the (k)(1) sources, including the primary interpretive sources under (k)(1)(i), such as the petition and initial investigation pertaining to the order at issue, previous determinations by Commerce (including prior scope rulings), and ITC reports pertaining to the order at issue. *See id.* Commerce may also consider the secondary interpretive sources under (k)(1)(ii) such as "any other determinations of [Commerce] or the [ITC] not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence." *See* 19 C.F.R. § 351.225(k)(1)(ii). To the extent such secondary sources conflict with the primary sources, however, the primary sources "will normally govern." *Id.*

If Commerce determines that descriptions of the merchandise contained in the (k)(1) sources are dispositive, Commerce issues a final scope ruling regarding whether the product falls within the order's scope. *See* 19 C.F.R. § 351.225(e); *see also Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). The (k)(1) sources are "dispositive" when they

"definitively answer the scope question." *Sango Int'l L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007). This Court reviews "Commerce's analysis of the (k)(1) sources against the product in question" as an issue of fact under the substantial evidence standard. *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 799 (Fed. Cir. 2020); *see also Meridian Prod.*, 851 F.3d at 1382 (citing *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 919-22 (Fed. Cir. 2014)).

Only when the (k)(1) sources are not dispositive will Commerce consider the five criteria set forth in § 351.225(k)(2). *See* 19 C.F.R. § 351.225(k)(2); *Fedmet Res. Corp.*, 755 F.3d at 918. These factors include: "(A) the physical characteristics of the merchandise; (B) expectations of the ultimate purchasers; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2)(i).

## III. Commerce's Scope Determination Is Supported By Substantial Evidence And In Accordance With Law

Commerce's determination that CBM is within the scope of the *Order* is supported by substantial evidence and is otherwise in accordance with law. Berger's claim that Commerce misapplied the regulatory framework is incorrect and overlooks Commerce's analysis of the record evidence in accordance with 19 C.F.R. § 351.225(k)(1) demonstrating that CBM is subject to the scope of the *Order*. Commerce properly considered the plain language of the scope and the (k)(1) sources, and substantial evidence supports Commerce's determination, therefore this Court must affirm Commerce's determination. Further, because Commerce found the scope language and the 19 C.F.R. § 351.225(k)(1) sources dispositive, an additional analysis under 19 C.F.R. § 351.225(k)(2) was not necessary.

**A.  Commerce Properly Determined CBM Is Subject To The *Order* Based On The 19 C.F.R. § 351.225(k)(1) Sources**

Berger argues that Commerce failed to properly consider the (k)(1) sources which Berger alleges demonstrate that CBM is not subject to the *Order* because CBM does not have the requisite priming/coating layer.  *See* Pl. Br. at 28-39.  However, as demonstrated below, Commerce "began by examining the CBM described in [Berger's] Scope Request in the context of the language of the scope of the *Order*" and found the description of the subject merchandise, coupled with the sources described in 19 C.F.R. § 351.225(k)(1), dispositive as to whether CBM is ultimately covered by the scope.  Final Scope Ruling at 14.

Pursuant to the (k)(1) framework, Commerce began its scope ruling by analyzing the language of the scope.  The scope of the *Order* covers artist canvases that have been primed/coated and "priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric."  *See Order*; *see also* Final Scope Ruling at 14.  Further, the term "artist canvases" is defined as "'pre-stretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placements' that 'are tightly woven prepared painting and/or printing surfaces.'"  *Id.*

Commerce found that record evidence submitted by Berger demonstrated that CBM is both primed/coated and meets the definition of an artist canvas.  Scope Ruling at 14.  Specifically, Commerce found CBM to be in-scope because, as Berger stated, it is a "'polyester fabric woven (*i.e.*, wrap and weft) filament fiber…that has been coated with polyvinyl acetate/acrylate type polymers'" and "is primed/coated 'for the purpose of converting a fabric into a canvas.'"  *Id.* at 14-15 (quoting Scope Ruling Application at 3 and Attachment 7).  Citing Berger's own submission, Commerce stated that the "priming/coating 'is required to stiffen the

fabric[,] giving it the stiffness properties of a canvas' and 'provides whiteness and higher opacity to the translucent polyester fabric.'" *Id.* at 15 (citing Scope Ruling Application at Attachment 7). Commerce also noted that CBM "enters the United States 'as rolls of coated fabric.'" *Id.*

Moreover, in its scope ruling application, Berger identified "several '[w]idely, publicly known uses[]' [for CBM] including 'canvas (art reproduction/stretching), roll-up display system, banner product, display x-kite system, wall covering, décor applications, and tenting.'" *Id.* at 15 (quoting Scope Ruling Application at 4, 29, 32, 34 and Attachment 10). Commerce noted that Berger "repeatedly refers to CBM as a canvas in its Scope Request," describes CBM as the "'top-seller for' latex, UV, and solvent ink application to canvas," "markets CBM for use as 'canvas frames' and 'stretched canvas,'" and stated that it "sold [CBM] to companies that print onto the canvas." *Id.* (quoting Scope Ruling Application at 4, 21, 32, 34 and Attachments 7, 9-10. Berger also stated that "[i]t is common sense that 'art reproduction' can occur on' the coated side of the fabric." *Id.* (quoting Scope Ruling Application at 32). Commerce reasonably found that this evidence submitted by Berger indicates that CBM is a "canvas roll and/or printable canvas that is primed/coated and is a woven prepared painting and/or printing surface." *Id.*

Commerce also found that its interpretation was further reinforced by the Tara Print Canvas Scope Ruling, in which Commerce determined that the print canvas at issue was subject to the *Order* because "print canvases are specifically cited in the scope language as an example of subject merchandise." *Id.* at 18 (citing Scope Ruling Request at Exhibit 19 (Tara Print Scope Ruling). Here, Berger "imports CBM as rolls of coated fabric that it distributes to customers for such uses as canvas (art reproduction/stretching), roll-up display system, banner product, display x-kite system, wall covering, décor applications, tenting, and canvas frames" and "repeatedly refers to CBM as a canvas." *Id.* Therefore, Commerce found that the "record evidence

demonstrates that CBM is a canvas roll and/or printing canvas" in accordance with the Tara Print Canvas Scope Ruling. *Id.*

To interpret the "priming/coating" scope requirement, Commerce further considered the primary interpretive sources set forth in 19 C.F.R. § 351.225(k)(1)(i). First, Commerce considered the ITC Final Report, which states "'[a]rtists' canvas is a surface for the graphic presentation of painted or printed images. It is made from woven fabric that is primed and coated ('gessoed') *to accept* paints or inks and is sold in a variety of shapes, sizes, textures, and formats.'" *Id.* at 16 (emphasis in original). Commerce acknowledged that although the ITC "used primed/coated and 'gessoed' interchangeably, *the focus is notably on preparing the fabric 'to accept' paints or inks* and on creating 'a surface for the graphic presentation of painted or printed images.'" *Id.* at 16 (emphasis added).

Second, Commerce found that its prior scope rulings under the *Order* reinforced this interpretation of priming/coating, noting that "Commerce has determined that priming/coating (*i.e.*, gessoing) a fabric to accept artist materials is 'understood to be synonymous with the priming/coating material or the application thereof, which promotes the adherence of artist materials.'" *Id.* at 17 (quoting Scope Ruling Application at Exhibit 15 (Impact Images Polyester Fabric Coated with Flame-Retardant and Polyurethane (PFCPU) Scope Ruling (Impact Images Scope Ruling)). Further, in the Impact Images Scope Ruling, Commerce "explained that gesso 'improves the receptivity of canvas to paint or other artistic materials, which helps clarify the scope's reference to priming or coating with a solution designed to promote the adherence of artist materials.'" *Id.* Therefore, Commerce reasonably concluded that "the [(k)(1)] materials demonstrate that Commerce and the ITC have defined 'promote the adherence' of artist materials

to mean 'allow for acceptance of,' 'improve[] the receptivity of canvas to,' or 'increase[] the canvas' receptivity to' artist materials." *Id*.

Against this backdrop, Commerce determined that CBM imported by Berger is primed/coated to promote the adherence of artist materials. *Id*. In so doing, Commerce examined the record and contrasted CBM to merchandise found not covered by the scope in prior scope rulings in which parties sufficiently demonstrated the merchandise was not primed/coated to increase the receptivity of artist materials such as, for example, because any such materials were applied directly to the fibers of the canvas' fabric, not to the canvas' surface coating. *Id*. at 17-19 (citing Scope Ruling Application at Exhibit 15, 16). Commerce likewise found that its determination that CBM is in-scope comported with a prior scope ruling in which Commerce found that merchandise that was primed/coated for a graphical purpose and prepared the canvas to receive ink was covered by the scope language. *Id*. at 19. So after considering the language of the scope of the *Order*, primary interpretive sources, and Berger's description of CBM, in accordance with 19 C.F.R. § 351.225(k)(1) as discussed above, Commerce reasonably determined that CBM is subject to the *Order* because CBM "is a canvas roll and/or printable canvas that is primed/coated and is a woven prepared painting and/or printing surface," and "the primed/coated side of the fabric is receptive to artist materials, consistent with our prior scope rulings." *Id*.

Berger incorrectly asserts that Commerce failed to consider the (k)(1) sources and that Berger provided "sources that clearly place CBM outside the scope." Pl. Br. at 28. In particular, Berger asserts that (1) the "priming/coating" requirement in the scope refers only to artist canvas that is primed/coated with the "specific acrylic latex 'gesso' bottom" used by petitioner in the underlying investigation; (2) Commerce "gloss[ed] over" record evidence purportedly indicating

that CBM's priming/coating does not promote the adherence of artist materials; and (3) Commerce impermissibly based its scope determination on end use rather than physical characteristics. *Id.* at 33. These arguments lack merit.

Berger argues that Commerce ignored Tara's (the petitioner in the underlying investigation) alleged intent and that "as the ITC and Commerce have recognized, it is unequivocally clear that Tara's specific acrylic latex 'gesso' bottom 'adherence' priming/coating formula is a prerequisite to artist canvas under the *Order*" Pl. Br. at 30. But as Commerce highlighted, the scope language does not refer to "gesso" nor does it "specify any limitations to the scope based on the particular formula of the priming/coating solution." Final Scope Ruling at 16. Additionally, while in a prior scope ruling Commerce determined that Ecker's (who purchased Tara's artist canvas production assets subsequent to the underlying investigation) gesso formula was "synonymous with priming/coating a canvas, the interchangeable use of the words 'gesso' and 'priming/coating' does not mean that Ecker['s] specific gesso formula is the *exclusive* priming/coating solution required of subject artist canvas." *Id.* at 16 (emphasis added). To the contrary, Commerce pointed out that during Commerce's scope inquiry on print canvas, Tara even acknowledged uncertainty as to what "processes and materials" foreign producers use to produce print canvas, contrary to Berger's claim that Commerce's determination ignores the petitioner's intent or that the priming/coating layer exclusively applies to a specific formula. *Id.* (citing Scope Ruling Application at Attachment 14). Accordingly, Commerce correctly found unavailing Berger's argument that a specific gesso formula is required by the scope pursuant to Commerce's analysis of the primary interpretive sources under 19 C.F.R. § 351.225(k)(1). *Id.*

Further, Berger contends that CBM is not covered by the scope because it has shown "CBM's priming/coating does not 'promote the adherence of artist materials.'" Pl. Br. at 32.

Berger asserts that Commerce "gloss[ed] over 'adherence' testing performed by Berger's third-party experts." *Id.* at 33. But this ignores that Commerce specifically considered this evidence in making its determination and still reasonably found that the priming/coating layer on the CBM promoted the adherence of artist materials. Final Scope Ruling at 16-18. Commerce noted that while Berger pointed to adherence tests of CBM's priming/coating by a laboratory and an individual examiner, "the individual examiner stated that 'no chemical analysis can characterize 'adherence' and no standardized tests are available to measure 'adherence.'" *Id.* Further, the examiner admitted "that the testing results reflect 'subjective qualitative judgement' based 'on whether the adherence of the ink was worse, the same, or better.'" *Id.* Commerce also explained that the report "is at times conflicting because the expert also concludes that the bottom priming/coating layer contributes 'slightly to absorption of ink,' which is an artist material identified in the scope." *Id.* (quoting Scope Ruling Application at Attachment 7).

Although Commerce acknowledged that "the third-party adherence testing results conclude that the CBM priming/coating solution does not promote the adherence of ink," Commerce also noted that Berger's testing relied on a third party's "subjective qualitative judgment" of "whether the adherence of the ink was worse, the same or better" with application of the CBM priming/coating solution. *Id.* at 16. Commerce explained that the ITC Final Report and Commerce's prior scope rulings – both (k)(1) primary interpretive sources – "have not interpreted 'adherence' so narrowly" and instead focus on whether the priming/coating layer "improves the receptivity of canvas to" or "increases the canvas' receptivity to artist materials." *Id.* Berger's proffered interpretation of the scope and the expert report "assumes an overly narrow definition of adhesion," and thus was of limited value when compared to other record

evidence indicating that CBM's priming/coating layer *does* increase the canvas' receptivity to artist materials. *Id* at 18.

Specifically, when considering whether CBM's priming/coating layer promotes adherence, as discussed above, Commerce looked to the ITC Final Report, which stated that artist canvas "'is primed and coated ('gessoed') *to accept* paints or inks and is sold in a variety of shapes, sizes, textures, and formats.'" *Id*. at 16 (emphasis in original). The ITC further noted that "the focus is notably on preparing the fabric 'to accept' paints or inks and on creating 'a surface for the graphic presentation of painted or printed images.'" *Id*. at 16. This was consistent with Commerce's prior scope rulings, like the Impact Images Scope Ruling, where Commerce "determined that priming/coating (*i.e.*, gessoing) a fabric to accept artist materials is 'understood to be synonymous with the priming/coating material or the application thereof, which promotes the adherence of artist materials.'" *Id*. at 17 (quoting Scope Ruling Application at Exhibit 15).

Further contrary to Berger's claim that CBM's priming/coating does not promote adherence, Pl. Br. at 30, Commerce found Berger's own words about its CBM clarifying: "[Berger] submitted a patent for 'CBM technology,' which described '*a receiving medium comprising a substrate and an ink receiving layer*.'" Final Scope Ruling at 17 (citing Scope Ruling Application at 6 and Attachment 12) (emphasis added). The CBM patent "states that an '*ink receptive coating*' is 'applied to a substrate such as . . . canvas,' creating a medium 'which yields a U.V. and water resistant ink jet print.'" *Id*. (emphasis added). Taking all of this into consideration, Commerce properly concluded that "the 19 CFR 351.225(k)(1) materials demonstrate that Commerce and the ITC have defined 'promote the adherence' of artist materials

to mean 'allow for acceptance of,' 'improve[] the receptivity of canvas to,' or 'increase[] the canvas' receptivity to' artist materials." *Id.*

Commerce also used (k)(1) sources to compare CBM to the merchandise at issue in the Impact Images Scope Ruling, where Commerce found PFCPU outside of the scope because Impact Images sufficiently demonstrated "that no priming or coating is applied to PFCPU that increases the canvas' receptivity to paint, ink or other artistic materials (*i.e.*, any graphics are applied to the canopy material regardless of coating, and the coating applied to PFCPU is applied for non-graphical purposes), it is distinguishable from in-scope material that is necessarily primed/coated to allow for acceptance of artistic materials." *Id.* Importantly, unlike CBM, "Commerce found Impact Images provided sufficient information demonstrating that '*any image/graphic/coloring of the PFCPU is achieved primarily through a process of dye sublimation applied directly to the fabric*, effectively dying the fibers of the fabric itself, and *not through the application of a material to the surface of the fabric*.'" *Id.* at 19 (emphasis added).

Two other scope rulings were illustrative on this point. In the Global Textile Blockout Fabric and Backlit Fabric Scope Ruling, Commerce found the inquiry merchandise outside of the scope because "'nothing on the record suggests that such coatings aid application of graphical media to the fabrics, nor contradicts Global Textile's statements that such coatings do not promote adherence of artist materials,'" and further that "Global Textile provided 'sufficient information to demonstrate that no priming or coating is applied to blockout and backlit fabric that increases the canvas's receptivity to paint, ink or other artistic materials.'" *Id.* at 19 (quoting Scope Ruling Application at Exhibit 16 (Global Textile Scope Ruling)). In the case before this Court, Berger did "not demonstrate that CBM is not primed/coated to accept, or be receptive to, artist materials and in fact the available record evidence indicates otherwise." *Id.*

Likewise, the RV Print Scope Ruling on EVACPET supports the finding that CBM is subject to the *Order*. *Id*. (citing Scope Ruling Application at Exhibit 18 (RV Print Scope Ruling)). Berger's interpretation of adherence, just like RV Print's, "[was] inconsistent with the history of the *Order* and the original investigation." *Id*. (citing RV Print Scope Ruling). Commerce found that that "RV Print (like [Berger]) did not demonstrate that its product's coating was applied for non-graphical purposes or that it does not increase the underlying canvas' receptivity to paint, ink, or other materials despite record evidence to the contrary." *Id*. Berger also "fail[ed] to demonstrate that [CBM]'s coating was applied for non-graphical purposes or that it does not increase the underlying canvas' receptivity to paint, ink, or other materials." *Id*. While Berger continues to argue that CBM and EVACPET are distinguishable (Pl. Br. at 18), Commerce explained that Berger "[did] not identify any differences that render the RV Print Scope Ruling inapplicable" nor did it identify or explain why any such differences "are meaningful to a scope analysis." Final Scope Ruling at 19.

Despite this thorough analysis and ample record evidence to the contrary, Berger insists that "[t]he facts are consistent that CBM's priming/coating does not 'promote the adherence of artist materials' and does not concern 'receptivity.'" Pl. Br. at 36. Berger maintains in its brief the incorrect assumption that the bottom layer of priming/coating must promote adhesion of artistic materials for it to be in-scope. *Id*. at 34. But Commerce considered and soundly rejected this argument during the scope proceeding. In particular, Commerce explained that "there is no requirement in the scope that the priming/coating be located on a specific portion of the artist canvas" and that the "distinction that [Berger] draws between 'bottom' and 'top' priming/coating is not supported by the record or the scope language." Final Scope Ruling at 18. Further,

Commerce noted that while Berger asserted CBM has two priming/coating layers (*i.e.*, bottom and top), "the patent indicates that the substrate has only one." *Id.*

Importantly, although it was afforded multiple opportunities to clarify this point, Berger never argued before Commerce "that CBM lacks a priming/coating layer that is applied for graphical purposes." Final Scope Ruling at 18. Commerce even asked Berger whether its CBM coating "increases receptivity to any artist materials." *Id.* at 17 (citing Scope Ruling Application at 27). But Berger only responded that "top coat in [*sic*] receptivity is not a requirement of the *Order*. In terms of [the] 'promoting the adherence' requirement . . . the bottom priming/coating does not 'promote the adherence' of the inks." *Id.* at 17-18 (citing Scope Ruling Application at 27-28). Thus, Berger did not actually answer Commerce's question and instead simply distinguished between CBM's priming/coating layer and top coat. *Id.* at 17-18.

Similarly, when Commerce "asked whether CBM's priming/coating layer aids the receptivity of latex, UV, and solvent inks, [Berger] again stated that ink receptivity is not required by the *Order* and that ink applications are end-use dependent." *Id.* (quoting Scope Ruling Application at 29-30). Commerce also asked "whether CBM is primarily used for the application of print or artistic materials, [Berger] answered that it 'cannot speculate what side is ultimately printed on by customers.'" *Id.* at 18. (citing Scope Ruling Application at 29-30). Therefore, Commerce properly concluded that the record "contains several instances in which [Berger] declines to affirmatively state that CBM lacks a priming/coating layer that is applied for graphical purposes and instead focuses exclusively on the adherence of the 'bottom' priming/coating layer," a distinction which Commerce noted "is not supported by the record or the scope language." *Id.*

Finally with respect to the (k)(1) interpretive sources, Berger argues that Commerce "seems to be confusing k(1) factors with the k(2) that it did not reach as part of its supposed analysis" and that "there is no 'use' requirement expressly stated in the scope." Pl. Br. at 31. Berger goes on to discuss how "end-use restrictions" are disfavored and what specific language Commerce employs when it "intends to impose" such restrictions. *Id.* Berger's argument is misplaced, however, because Commerce did not find that the scope of the *Order* has end-use restrictions. Rather, as set forth above, Commerce properly considered whether CBM falls within the scope of the *Order* based on the plain language of the scope as well as other primary interpretive sources set forth in 19 C.F.R. § 351.225(k)(1). *See* Final Scope Ruling at 14-20. Because these sources focus in part on whether the artist canvas contains a priming/coating layer that increases the receptivity of the canvas to artist materials, Commerce appropriately considered statements Berger made describing how CBM is used and marketed. Final Scope Ruling at 14-20. Commerce found that Berger's statements indicating that CBM is a canvas that is used for art reproduction, along with other evidence, support its finding that CBM is a "canvas roll and/or printable canvas that is primed/coated and is a woven prepared painting and/or printing surface" within the meaning of the *Order*. *Id.* at 15. Commerce properly considered Berger's statements as relevant record evidence in determining whether CBM is covered by the scope language coupled with the 19 C.F.R. § 351.225(k)(1) sources. In so doing, Commerce did not, as Berger asserts, improperly read an end-use restriction into the scope or confuse the (k)(1) and (k)(2) factors.

In sum, Commerce conducted a comprehensive (k)(1) analysis of the record evidence to reasonably determine that CBM is subject to the *Order*. This Court should uphold Commerce's determination because it is not contrary to the *Order*'s terms, nor does it change the *Order*'s

scope.  *See Mid Continent*, 725 F.3d at 1300.  Furthermore, even if this Court were to find that

Berger's arguments had merit, Commerce provided a reasoned explanation based on record

information as to why CBM should properly be considered within the meaning of the scope.

Therefore, even if it were possible to draw two inconsistent conclusions from the evidence

contained in the record, Commerce's findings are still supported by substantial evidence.  *See*

*Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1996); *Nippon Steel Corp. v. United*

*States,* 458 F.3d 1345, 1352 (Fed. Cir. 2006).  Here, Berger's arguments at best demonstrate that

it disagrees with Commerce, but the arguments fail to demonstrate that Commerce's

determination was unreasonable.  Accordingly, this Court should uphold Commerce's analysis

under 19 C.F.R. § 351.225(k)(1).

**B.** **Commerce's Determination Not To Conduct An Analysis Under 19 C.F.R. § 351.225(k)(2) Is In Accordance With Law And Supported By Substantial Evidence**

Pursuant to 19 C.F.R. § 351.225(k)(2)(i), "[i]f the Secretary determines that the sources

under paragraph (k)(1) of this section are not dispositive, the Secretary will then further

consider" the factors under paragraph (k)(2).  Berger argues that "Commerce did not examine

any of the (k)(2) factors" and that failure "renders its *Scope Ruling* as unsupported by substantial

evidence."  Pl. Br. at 39.  However, as explained in detail above, Commerce found its analysis of

the sources under paragraph (k)(1) dispositive as to whether CBM is covered by the scope of the

*Order* and thus did not consider the sources under paragraph (k)(2).  Final Scope Ruling at 14,

20.  Because Commerce is not required to consider the additional factors under paragraph (k)(2)

where the sources under paragraph (k)(1) are dispositive, Commerce properly limited its analysis

to the (k)(1) sources.  19 C.F.R. § 351.225(k)(2)(i).

Berger asserts that "in its [scope ruling application], Berger demonstrated that the factors that Commerce is supposed to consider pursuant to the '(k)(2) factors' would cause Berger's CBM to be outside the scope of the *Order*." Pl. Br. at 38-39. But this argument misstates the law. Because Commerce found the sources under paragraph (k)(1) dispositive, it was not required to and did not consider the additional factors under paragraph (k)(2). 19 C.F.R. § 351.225(k)(2)(i). Thus, whether or not the factors under paragraph (k)(2) support Berger's contention is ultimately irrelevant and does not detract from Commerce's determination that CBM is subject to the scope of the *Order*. Commerce properly followed the analytical framework and procedures set forth in its regulations. 19 C.F.R. § 351.225; *see also Shenyang*, 776 F.3d at 1359 (finding that when Commerce finds that (k)(1) factors are dispositive, it is proper to decline a (k)(2) analysis). Accordingly, this Court should uphold Commerce's determination under (k)(1) and decline Berger's invitation to discuss the (k)(2) factors because Commerce's determination under (k)(1) was dispositive, supported by substantial record evidence, and is in accordance with law.

## IV.     Commerce Did Not Unlawfully Expand The Scope Of The *Order*

Berger argues that "when read in the entirety, the plain meaning and context of the reference 'designed to promote the adherence of artist materials' in the scope language compels a narrow interpretation of the words 'priming/coating.'" Pl. Br. at 11. But Commerce did not interpret the scope in a manner that is contrary to its terms, nor did Commerce change the scope of the *Order*. Rather, in determining whether CBM is covered by the scope language, Commerce "carefully considered the information presented by [Berger] and [] determined that the scope contains language that includes, or 'may be reasonably interpreted to include,' [CBM]." *Id.* at 10 (quoting *Duferco Steel*, 296 F.3d at 1094-95). Further, regarding the meaning

of "adherence," Commerce's interpretation is "consistent with how Commerce and the ITC have interpreted this term throughout the history of this proceeding." *Id*.

Berger's arguments that Commerce exceeded its legal authority reflect confusion, both as to the record and the law, and should be rejected. As an initial matter, to the extent Berger argues that Commerce was required to rely on dictionary definitions to interpret the scope, Berger is incorrect. *See* Pl. Br. at 14, 24. Rather, under the relevant regulation, Commerce "may" make its determination on scope language alone but is also empowered to consider primary interpretive sources at its discretion. *See* 19 C.F.R. § 351.225(k)(1)(i). This regulatory structure reflects "Commerce's understanding that the sources listed in current § 351.225(k)(1) were always intended to be interpretive tools to understand the plain meaning of the scope, recognizing that terms that may have been plain at the time they were drafted and adopted upon the issuance of the order could be interpreted differently at some later point." *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 Fed. Reg. 52,300, 52,322-23 (Dep't of Commerce Sept. 20, 2021). Therefore, Commerce lawfully used primary interpretive sources like the ITC Report and prior scope rulings in this case to interpret the plain meaning of the scope. Commerce also lawfully elevated primary interpretive sources above other secondary sources, such as dictionary definitions. *See* 19 C.F.R. § 351.225(k)(1)(ii) (providing that "primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue"). Additionally, though Berger cites dictionary definitions, Berger does not apply those definitions to this case, nor does it articulate why Commerce's analysis in this case contravened those definitions. Moreover, Berger does not explain why those definitions are more probative of industry usage than the (k)(1) sources that Commerce examined in this case. *See* Pl. Br. at 14-15. In any event,

as Commerce noted in its scope ruling, Commerce has never relied on those definitions to interpret the *Order* and thus they are *secondary* interpretive sources that would yield to primary interpretive sources in the event of a conflict.  *See* Final Scope Ruling at 17 (stating that "[w]hile Berger [] presents a definition of adherence, it does not identify any segment of this proceeding in which Commerce adopted this definition").

This misunderstanding underpins Berger's misplaced arguments that Commerce has "expanded" the scope of the *Order* in its prior scope rulings.  Pl. Br. at 15.  For example, Berger claims that "Commerce stated that Berger's CBM is within the scope of the *Order* because the 'CBM is a canvas roll and/or printable canvas that is primed/coated and is a woven *prepared painting and/or printing surface ...* that the primed/coated side of the fabric *is receptive to artist materials, consistent with our prior scope rulings*" and that as a result "Commerce shifts the language away (unlawfully *expands* the Order) from the language of the Order and that of the intent of the Tara."  Pl. Br. at 12 (emphasis in original).  But Commerce did not unlawfully expand the *Order* simply because it relied on (k)(1) sources to interpret the plain language of the scope as it relates to the priming/coating requirement.  Rather, Commerce properly used these sources under 19 C.F.R. 351.225(k)(1) to *interpret*, rather than *expand* the *Order*.

Along those lines, Berger further argues that Commerce unlawfully expanded the scope of the *Order* by interchanging the term "adherence" with "receptive/receptivity terms as physical characteristics" in the Impact Images Scope Ruling, the Global Textile Scope Ruling, the Permalite Scope Ruling, and the RV Print Scope Ruling. Pl. Br. at 15-19 (citing Scope Ruling Application at Exhibit 10 (Permalite Scope Ruling)).  Berger also argues that "Tara contributed to the scope creep with its own scope ruling in 2015 . . . [because] Tara did not distinguish the acrylic latex 'gesso' bottom 'adherence' priming/coating from that of the ink receptive top coat

as described in the *Order*." *Id.* at 20. Berger then states "according to the history and the scope of the Order, there are two distinct coating types (bottom versus top) with distinct physical characteristics ('gesso' 'adherence' versus 'receptive')" without further explanation or citation to record evidence. But again, Commerce did not "interchange" the term adherence with anything else. Instead, Commerce *interpreted* the term "adherence" using (k)(1) sources.

Moreover, Berger's argument that Commerce's prior scope rulings are unlawful are unavailing. The question before the Court is whether Commerce's determination that CBM is within the scope of the *Order* is supported by substantial evidence and the governing regulatory framework. Because the prior scope rulings are primary interpretive sources under 19 C.F.R. § 351.225(k)(1), Commerce appropriately relied on those scope rulings and other evidence such as the ITC Final Report to interpret the scope language. Commerce also noted that "[n]either [Berger] nor any other party challenged Commerce's findings in those [prior] scope rulings." *Id.*

Berger also puts forward a slippery slope argument, that "[i]f Commerce expands the scope of the *Order* by basing its scope analysis on additional characteristics concerning the acrylic latex 'gesso' bottom 'adherence' priming/coating, then legitimately produced coated fabric products face the inevitable 'scope creep.'" *See* Pl. Br. at 22. According to Berger, "past rulings and reliance upon § 351.225(k)(1) cannot save a scope determination that is based on an unreasonable interpretation of the scope language." *See id.* at 24 (quoting *Whirlpool Corp. v. United States*, 144 F. Supp. 3d 1296, 1303 (Ct. Int'l Trade 2016)). However, as set forth above, Berger's assertion that Commerce cannot rely on (k)(1) sources to interpret the *Order*'s plain language is wrong. Commerce looked to the scope language such as "subject merchandise includes canvases 'that have been primed/coated' and that 'priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or

25

ink, to the fabric.'" Final Scope Ruling at 14. As Commerce explained, "contrary to what [Berger] appears to argue in this case, past interpretive rulings on whether a product falls within the scope do not result in an increasingly vague scope *but instead provide additional clarity* to any areas where the scope may not be sufficiently clear as it relates to certain merchandise." *Id.* at 9 (emphasis added).

Berger appears to suggest that this Court should *infer* that Commerce added new characteristics to the scope by referencing pictures of canvas "similar to Tara's acrylic coated fabric" that purportedly would be subject to the *Order*. *See* Pl. Br. at 22. First, these pictures are not on the record. Because these examples were not on the record before Commerce, this Court should not consider them either. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (explaining that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court" (citation omitted)). In any event, Berger does not explain the relevance of the pictures to this case. Commerce made no determination regarding whether products other than CBM would be subject to the scope of the *Order* and, therefore, Berger's speculation that other products would necessarily be covered is unfounded. In *Adams Thermal Sys., Inc. v. United States*, 279 F. Supp. 3d 1195 (Ct. Int'l Trade 2017), the Court rejected a similar argument, holding that "[i]n the administrative proceeding giving rise to [that] case, the Department's responsibility was to decide whether the [inquiry merchandise] [was] within the scope of the Orders. Commerce was not required to announce an interpretation resolving future questions as to that scope, and the Final Scope Ruling did not do so." *See id.* at 1207–08. This Court should reject Berger's argument here.

Finally, while arguing that Commerce's prior scope rulings unlawfully interpreted the scope language relating to adherence, Berger also curiously asserts that "neither Tara, nor the agencies discussed the meaning of neither 'promote' nor 'adherence' as it pertains to the scope of the Order." Pl. Br. at 14-15. This is incorrect. In the Final Scope Ruling, Commerce stated:

> [W]e note that the ITC and our prior scope rulings have not interpreted "adherence" so narrowly. The ITC stated that "[a]rtists' canvas is a surface for the graphic presentation of painted or printed images. It is made from woven fabric that is primed and coated ('gessoed') *to accept* paints or inks and is sold in a variety of shapes, sizes, textures, and formats." Although the ITC used primed/coated and "gessoed" interchangeably, the focus is notably on preparing the fabric "to accept" paints or inks and on creating "a surface for the graphic presentation of painted or printed images."

Final Scope Ruling at 16 (citations omitted). Further, Commerce explained that:

> While [Berger] presents a definition of adherence, it does not identify any segment of this proceeding in which Commerce adopted this definition. Rather, Commerce has determined that priming/coating (*i.e.*, gessoing) a fabric to accept artist materials is "understood to be synonymous with the priming/coating material or the application thereof, which promotes the adherence of artist materials." Commerce further explained that gesso "improves the receptivity of canvas to paint or other artistic materials, which helps clarify the scope's reference to priming or coating with a solution "designed to promote the adherence of artist materials." . . . Therefore, the 19 CFR 351.225(k)(1) materials demonstrate that Commerce and the ITC have defined "promote the adherence" of artist materials to mean "allow for acceptance of," "improve[] the receptivity of canvas to," or "increase[] the canvas' receptivity to" artist materials.

*Id*. at 17 (citations omitted). Thus, Commerce explicitly discussed the meaning of "promote" and "adherence" as they pertain to the scope. *Id*. Commerce's interpretation did not change the scope of the *Order*, nor did Commerce interpret the scope contrary to its terms. *See, e.g.*, *Eckstrom*, 254 F.3d at 1072 (Fed. Cir. 2001). Commerce determined that the *Order*'s scope "contain[s] language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *See Duferco Steel*, 296 F.3d at 1094-95. Consequently, Commerce's

interpretation of the scope and its determination that CBM is covered by the language of the *Order* was reasonable and did not constitute an unlawful expansion of the *Order*.

## V.    The *Order* Is Not Void-For-Vagueness, Did Not Deny Berger Adequate Notice, And Is Not Otherwise Unconstitutional

Berger claims that "Commerce's interpretations of the *Order* raise serious due process concerns because such vague and open-ended language has caused absurd results in antidumping duties being imposed on importers without adequate notice." *See* Pl. Br. at 33. This claim is without merit. As discussed above, Commerce has consistently looked to the plain language of the scope, in conjunction with prior scope rulings and ITC determinations to clarify, interpret, and apply the plain language of the scope of the *Order*. Further, Berger cannot demonstrate, and the record does not support, that Berger was deprived of either adequate notice or due process.

As a threshold matter, the *Order* is not vague and open-ended. The language clearly sets forth what merchandise is covered by the scope. Additionally, Berger does not substantiate its vagueness claim; it merely concludes that, because it sought clarification as to whether CBM is covered by the *Order*, the language of the *Order* must be vague. Berger cites hypothetical products that Berger purports could be subject to the *Order*, therefore leading to "absurd results." *See* Pl. Br. at 22-24. But these hypothetical products are not relevant to this case and should not be considered.

Commerce's regulations notify the public how to request a scope ruling when a question arises as to whether a specific product is covered by the *Order*. *See* 19 C.F.R. § 351.225. Indeed, Berger availed itself of this process. As Commerce explained, "while the scope of an order is always intended to be as clear and well defined as possible, over time, questions may rise about whether a specific product falls within the scope." Final Scope Ruling at 9. When such questions arise, parties may use the scope inquiry mechanism, as Berger did, for the precise

28

purpose of determining whether a product is subject to the scope of an order. *Id.* Commerce's interpretive scope rulings in response to such questions "do not result in an increasingly vague scope but instead provide additional clarity to any areas where the scope may not be sufficiently clear as it relates to certain merchandise." *Id.*

In prior scope rulings pertaining to this specific *Order*, Commerce analyzed the scope language coupled with the 19 C.F.R. § 351.225(k)(1) sources. *Id.* at 4-7. As Commerce pointed out, "[n]either Berger nor any other party challenged Commerce's findings in those scope rulings." *Id.* at 9. Therefore, in accordance with 19 C.F.R. § 351.225(k)(1)(c), Commerce considered those rulings in determining whether CBM is subject to the *Order*. *Id.* at 10. Rather than unlawfully expanding the scope as Berger contends, Commerce properly considered the interpretive sources under the regulation and "carefully considered the information presented by [Berger] and . . . determined that the scope contains language that includes, or 'may be reasonably interpreted to include,'" CBM. *Id.* Commerce's determination as to the meaning of "adherence" was "consistent with how Commerce and the ITC have interpreted this term throughout the history of this proceeding." *Id.* As a result, Commerce's interpretation of adherence was not arbitrary and capricious, and "interested parties [were] afforded 'fair warning of what is proscribed.'" *Id.*

By filing its scope ruling application, Berger properly availed itself of the opportunity to request that Commerce determine whether its product is subject to the *Order*, and to present arguments and evidence supporting its position. Berger's underlying scope ruling application demonstrates that it was on notice that its product could be subject to the *Order*. Commerce's final scope ruling therefore did not deprive regulated parties of "fair warning of the conduct [that the order at issue] prohibits or requires," and is thus not the appropriate target for a due process

claim. *See Mid Continent*, 725 F.3d at 1300-1301 (citing *SmithKline Beecham Corp.*, 567 U.S. 142). Commerce appropriately relied on the language of the *Order*, which it found covers CBM. Final Scope Ruling at 14; *See Duferco Steel*, 296 F.3d at 1094-95) (observing that courts grant Commerce substantial deference in interpreting its own orders, provided the orders "contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it"). Moreover, any argument that Commerce's determination raises due process concerns by depriving parties adequate notice is undermined by the fact that the final scope ruling is consistent with Commerce's interpretation in prior scope rulings, which Berger even argues advanced a similar, though "unlawfully vague," interpretation of the scope. *See* Final Scope Ruling at 14-20; *see generally* Pl. Br. at 12-25.

Berger also fails to demonstrate that Commerce has deprived it of due process in the scope proceedings. In *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1190-1191 (Ct. Int'l Trade 2004), which Berger cites in support of its contention, *see* Pl. Br. at 27, the Court found Commerce improperly interpreted the scope of an order contrary to its terms by finding merchandise subject to the order whose edges were not beveled but where the scope plainly applied to merchandise with beveled edges. Here, Commerce did not interpret the scope language contrary to its plain language nor did Commerce "nullify portions of an order's scope language which would otherwise exclude a plaintiff's product." *See Allegheny Bradford*, 342 F. Supp. 2d at 1190. Rather, as previously discussed, Commerce properly found CBM subject to the *Order* by looking at the scope language which plainly covers "artist canvases . . . that have been primed/coated." Final Scope Ruling at 2. Commerce's scope rulings and *Order* in this case are unlike *Allegheny Bradford*, and ultimately provided fair notice to parties as to the applicability of the *Order* to its product.

Berger also cites *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487, 495 (Fed. Cir. 2020), for the proposition that an agency must "provide regulated parties fair warning of the conduct [the order or regulation] prohibits or requires" to no avail. *See* Pl. Br. at 25. This case is not applicable here; *Tai-Ao* involved a circumvention inquiry in which the Court found that Commerce failed to properly notify a party in the initiation notice that it was subject to the inquiry and thus it was not until preliminary determination that Commerce could suspend liquidation based on its affirmative finding. 983 F.3d at 495. Here, Commerce properly placed all parties on notice of the *Order*'s applicability through its publication in the *Federal Register* and clearly setting forth in the scope language what merchandise is subject to the *Order*. Final Scope Ruling at 1; *see also Order*.

In *Adams Thermal Systems*, the Court rejected a similar argument set forth by plaintiff arguing that the *Order*, as a result of a scope ruling, was unlawful for vagueness and lack of notice or due process. 279 F. Supp. 3d at 1207-08. In that case, the Court rejected plaintiff's argument, finding its citations to *Mid Continent*, *Duferco*, and *ArcelorMittal Stainless Belgium N.V.* (all also cited by Berger) were unavailing because "Commerce did not base the Final Scope Ruling on an unreasonable or impermissibly broad interpretation of the scope language." *Adams Thermal Systems*, 279 F. Supp. 3d at 1208 (discussing *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012)). As discussed throughout this brief, Commerce did not base its determination on an "unreasonable or impermissibly broad interpretation" of the language in the *Order*. *Id.* Accordingly, Commerce's application of the scope language was reasonable, and, therefore, did not infringe on Berger's due process.

**CONCLUSION**

For these reasons, we respectfully request that the Court deny Berger's motion and

sustain Commerce's final scope ruling.

<div style="margin-left: 50%;">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ Christopher A. Berridge
CHRISTOPHER A. BERRIDGE

</div>

OF COUNSEL:
Joseph Grossman-Trawick
Attorney
U.S. Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement and Compliance
Washington, D.C.

Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-0537
E-mail: Christopher.Berridge@usdoj.gov

April 25, 2024

Attorneys for Defendant

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 9,379 words, including text, footnotes, and headings.


<u>/s/Christopher A. Berridge</u>

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| PRINTING TEXTILES, LLC DBA BERGER TEXTILES, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES, )<br>)<br>Defendant, )<br>)<br>and )<br>)<br>ECKER TEXTILES, LLC, )<br>)<br>Defendant-Intervenor. )<br>) | Court No. 23-00192 |

## <u>ORDER</u>

Upon consideration of the motion for judgment upon the administrative record filed by plaintiff, responses thereto, plaintiffs' reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED;

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

_____
JUDGE

Dated: _____