**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before: Hon. Timothy C. Stanceau, Senior Judge**

| | |
|---|---|
| _____ x | |
| : | |
| PRINTING TEXTILES, LLC : | |
| DBA BERGER TEXTILES, : | |
| : | |
| Plaintiff, : : | |
| : Court No. 23-00192 | |
| v. : | |
| : | |
| UNITED STATES : | |
| : | |
| Defendant. : | |
| _____x | |

**RESPONSE BRIEF OF**
**DEFENDANT-INTERVENOR ECKER TEXTILES, LLC**
**TO**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Thompson & Associates, PLLC
1050 Connecticut Avenue, NW
Suite 500
Washington, DC  20036
Tel: 202-772-2039

Attorney for Defendant-Intervenor Ecker
Textiles, LLC

Dated: April 25, 2024

# TABLE OF CONTENTS

Summary of Argument ………………………………………………………........................... 1

Scope and Standard of Review ......................................................................................... 2

Argument ....................................................................................................................... 3

A.  Description of Berger Textiles' CBM Product …………….................................... 3

B.  The Commerce Determination .................................................................... 5

C.  The Scope Language Explicitly Describes CBM ...................................... 8

D.  CBM Is Coated with an Ink Receptive Solution within the Order's Coverage .................. 11

E.  The CBM Scope Ruling Is Supported by Substantial Evidence …........................... 13

F.  The Scope Does Not Require that Imported Artist Canvas Be Made with the Same
Materials and Processes as those of the Domestic Industry ................................ 19

G.  Conclusion ...................................................................................... 22

## Judicial Decisions

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...................................................... 2

*Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215
(Fed. Cir. 005) ............................................................................................................. 2

*Fedmet Res. Corp. v. United States*, 755 F.3d 912
(Fed. Cir. 2014) ......................................................................................................... 10

*Global Commodity Group LLC v. United States*, 709 F.3d 1134
(Fed. Cir. 2013) ........................................................................................................... 2

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...................................................... 2

*Huaiyin Foreign Trade Corp. v. United States,* 322 F.3d 1369
(Fed. Cir. 2003) ......................................................................................................... 14

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927
(Fed. Cir. 1984) ........................................................................................................... 2

*Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315
(Ct. Int'l Trade 2014) ............................................................................................... 14

## Statutes/ Regulations

19 U.S.C. § 1516a(b)(1)(B)(i) ....................................................................................... 2

19 C.F.R. §§ 351.225(c)(2)(i) ...................................................................................... 18

19 C.F.R. § 351.225(k)(1)(i) ...........................................................................................8

19 C.F.R. § 351.225(k) ......................................................................................... *passim*

## Administrative Decisions & Publications

*Certain Artist Canvas from the People's Republic of China: Continuation of the Antidumping Duty Order*, 82 Fed. Reg. 14,502 (March 21, 2017) .............................................................. 8

Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse ("CBM Scope Ruling") on August 15, 2023 .............................................................................................. *passim*

This Response Brief is filed on behalf of defendant-intervenor Ecker Textiles, LLC ("Ecker Textiles"), pursuant to Rules 56.2 and 81 of the Rules of the United States Court of International Trade and the Scheduling Order entered in this action. It addresses the arguments presented by the plaintiff, Printing Textiles, LLC dba Berger Textiles ("Berger Textiles"). For the reasons discussed below, Berger Textiles' Motion for Judgment on the Agency Record should be denied, and this case dismissed.

Ecker Textiles is a manufacturer of the domestic like product. It is the successor in interest to the petitioner in the antidumping investigation, Tara Materials, Inc., as it purchased the assets of that company. Ecker Textiles participated in the administrative proceedings which resulted in the challenged scope determination.

Berger Textiles filed its Application of Scope Ruling on Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China (the "CBM Scope Request") on December 15, 2022. The Commerce Department ("Commerce") issued its Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse ("CBM Scope Ruling") on August 15, 2023. The CBM Scope Ruling determined that Berger Textiles' Canvas Banner Matisse ("CBM") product was within the scope of the antidumping duty order on Artist Canvas from the People's Republic of China ("the order")

## SUMMARY OF ARGUMENT

1.     The scope of the order describes "artist canvases regardless of dimension and/or size, whether assembled or unassembled, that have been primed/coated, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat. Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric."

CBM meets this description. It is a fabric which has been primed/coated with a solution designed to promote the adherence of artist materials. Information submitted with Berger Textiles' scope request establish that CBM is intended for use as printing canvas. The plain language of the order thus applies to the product.

2.      Berger Textiles' argument that an ink receptive priming solution is a prerequisite for coverage is contradicted by the plain language of the order. A product is covered if it is coated with "solution designed to promote the adherence of artist materials." CBM has such a coating, and is consequently within the order's scope.

3.      The scope language does not support Berger Textiles' argument that CBM must be made of the same materials, and with the same processes, as employed by the domestic industry in producing the domestic like product. As long as a product consists of canvas coated with "solution designed to promote the adherence of artist materials" it is covered.

## SCOPE AND STANDARD OF REVIEW

This court must apply the "substantial evidence" standard in reviewing Commerce scope determinations. The determination must be affirmed unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Global Commodity Group LLC v. United States*, 709 F.3d 1134 (Fed. Cir. 2013). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938), *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Reviewing courts must "grant significant deference to Commerce's interpretation of a scope order and [ ] will affirm Commerce's scope ruling unless the record lacks "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir.

2005) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

# ARGUMENT

## A.    Description of Berger Textiles' CBM Product

Commerce described the merchandise covered by Berger's scope application as

follows:

> CBM, which Berger Textiles describes as 600 denier 100 percent polyester fabric woven (*i.e.*, warp and weft) filament fiber, weighing approximately 270 grams per square meter, that is coated on one side with polyvinyl acetate/acrylate-type polymers and is packaged as rolls of coated fabric of various lengths to be distributed to Berger customers. The coated side of the fabric contains hydrophobic sealing and fireproof agents. The coating is visible to the naked eye because it is visible in the interstices of the fabric, and the weave is blurred.  Berger Textiles explains that CBM is produced in and exported from China to the United States in rolls of various lengths. Berger Textiles submitted photographs of, and product testing pertaining to, CBM.

> Berger Textiles identifies several uses of CBM, including as canvas (art reproduction/stretched), wall covering, and décor applications.

CBM Scope Ruling at 4. The CBM Scope uling request included the following additional

information regarding the product's attributes and uses.

Berger Textiles' marketing materials described the product as a canvas for printing.

For example, the data sheet in Attachment 10 of the CBM Scope Request stated:

> Applications:
> Roll up Display Systems
> Display X-Kite Systems
> banners
> Textile wallpaper
> art reproduction
> stretched canvas
> Topseller! Matt economy canvas for art
> reproduction, roll-ups, banners etc. /
> Important for Latex-print: glossy print with
> high color brilliance, water- &
> scratch-resistance better than with 4446-56

The "Product Data" document, also in Attachment 10, identified the product's applications as:

> canvas frames / art reproduction

roll up display systems
wall covering
banners

It included this graphic:



Berger Textiles further explained that "The production process uses numerous raw materials – polyester (poly ethylene terephthalate) fabric woven (i.e., warp and weft) filament fiber, polyvinyl acetate / acrylate type polymers. The process consists of applying multiple coatings to the polyester." *Id*. at 5. It also asserted that "CBM's technology" uses techniques "where the receiving medium (i.e., priming/coating) is meant for yielding 'a U.V. and water resistant ink jet print'" specified in U.S. Patent 5,853,899. *Id*. at 6. As discussed in detail below, the description in the patent 5,853,899 states that the products it encompasses consist of a "receiving medium comprising a substrate and an ink receiving layer."

Commerce unsuccessfully sought additional information from Berger Textiles regarding the purpose of the coating. As explained in the CBM Scope Ruling:

> Commerce asked Berger Textiles, "whether the coating increases receptivity to any artist materials…."  In response, Berger Textiles only stated that "top coat in {*sic*} receptivity is not a requirement of the *Order*. In terms of {the} 'promoting the adherence' requirement…the bottom priming/coating does not 'promote the adherence' of the inks." Additionally, when asked whether CBM is primarily used for the application of print or artistic materials, Berger Textiles answered that it "cannot speculate what side is ultimately printed on by customers." Furthermore, when asked whether CBM's priming/coating layer aids the receptivity of latex, UV, and solvent inks, Berger Textiles again stated that ink receptivity is not required by the *Order* and that ink applications are end-use dependent.

**B.      The Commerce Determination**

The CBM Scope Ruling concluded that Berger Textiles' CBM is in-scope merchandise.

First, Commerce concluded, "based on the record evidence, that CBM is a canvas roll and/or printable canvas that is primed/coated and is a woven prepared painting and/or printing surface. Additionally, the record evidence indicates that the primed/coated side of the fabric is receptive to artist materials, consistent with our prior scope rulings . . ." Citing Berger Textiles' own statements, it rejected contradictory assertions that CBM had purposes other than serving as a print medium:

> While Berger Textiles states that the polyester canvas underlying CBM is not for use in art reproduction, record evidence contradicts this argument. As noted above, Berger Textiles repeatedly states that art reproduction is a "{w}idely, publicly known use{}" of CBM. The producer of CBM markets the product for canvas applications, and Berger markets CBM "for art reproduction" and for use as "stretched canvas." Additionally, Berger Textiles identifies CBM as the "top-seller for" latex, UV, and solvent ink application to canvas. Furthermore, Berger Textiles markets CBM as "economy canvas for art reproduction" for use with, but not limited to, "glossy print with high color brilliance." We note that, while Berger Textiles impugns CBM's ability to produce quality art reproduction, the product's quality does not determine whether it is subject to the Order. Based on the above factors, we find that the record contains substantial evidence that Berger Textiles and the producer market CBM for use in art reproduction.

CBM Scope Ruling at 15 (footnotes omitted).

Commerce then determined that the priming/coating on CBM met the requirements for coverage:

> We disagree with Berger Textiles' argument that CBM lacks a priming/coating solution for the purposes of the scope of the *Order*. Specifically, Berger Textiles argues that, because its priming/coating solution is chemically different than that of Ecker Textiles' print canvas, CBM is outside the scope of the *Order*. Berger Textiles contends that Ecker Textiles' specific gesso formula is a requisite component of artist canvas. While Commerce has previously found that the application of gesso is synonymous with priming/coating a canvas, the interchangeable use of the words "gesso" and "priming/coating" does not mean that Ecker Textile's specific gesso formula is the exclusive priming/coating solution required of subject artist canvas. Notably, the scope language does not include the word "gesso" or specify any limitations to the scope based on the particular formula of the priming/coating solution. Indeed, Tara previously

acknowledged uncertainty regarding the "processes and materials" that Chinese manufacturers use to produce print canvas. Accordingly, we find that Berger Textiles has not distinguished its priming/coating solution from solutions that cause a fabric to become subject artist canvas.

CBM Scope Ruling at 16 (footnotes omitted).

Commerce thereafter rebutted the position that the CBM ruling was inconsistent with prior ones issued regarding the Artist Canvas from China order. In particular, Berger Textiles claimed previous rulings established "that gesso that promotes the adherence of artist materials is a requisite component of artist canvas." It submitted "third-party adherence testing results" which "conclude[d] that the CBM priming/coating solution does not promote the adherence of ink, an artist material identified in the scope of the *Order*."

Commerce dispensed with this argument by first noting "the individual examiner admits that the testing results reflect 'subjective qualitative judgement' based 'on whether the adherence of the ink was worse, the same, or better.'" Moreover, the agency had not given the term "adherence" as narrow a meaning as Berger Textiles and its third-party testers sought to, nor did the ruling request "identify any segment of this proceeding in which Commerce adopted this definition." Surveying previous scope determinations, the ruling observed "Commerce has determined that priming/coating (*i.e.*, gessoing) a fabric to accept artist materials is 'understood to be synonymous with the priming/coating material or the application thereof, which promotes the adherence of artist materials . . . gesso 'improves the receptivity of canvas to paint or other artistic materials,' which helps clarify the scope's reference to priming or coating with a solution 'designed to promote the adherence of artist materials.'"

In light of the scope language and its interpretation in earlier rulings, Commerce's conclusion was "the 19 CFR 351.225(k)(1) materials demonstrate that Commerce and the

ITC have defined 'promote the adherence' of artist materials to mean 'allow for acceptance of,' 'improve{} the receptivity of canvas to,' or 'increase{} the canvas' receptivity to' artist materials." CBM Scope Ruling at 17 (footnotes omitted.)

Commerce then reviewed the attributes of CBM in light of the order's terms to find that Berger Textiles' product was within the scope.

> Here, record evidence indicates that CBM is marketed for art reproduction and that art reproduction is a "{w}idely, publicly known use{}" of CBM. In fact, the record contains evidence that CBM has a priming/coating layer that increases the canvas' receptivity to artist materials. Specifically, Berger Textiles submitted a patent for "CBM technology," which described "a receiving medium comprising a substrate and an ink receiving layer." The patent states that an "ink receptive coating" is "applied to a substrate such as…canvas," creating a medium "which yields a U.V. and water resistant ink jet print." Although Berger Textiles argues that the "bottom priming/coating does not promote the adherence of artistic materials," there is no requirement in the scope that the priming/coating be located on a specific portion of the artist canvas. Additionally, the patent indicates that the substrate has only one priming/coating layer (i.e., the ink receptive coating), notwithstanding Berger Textile's assertion that there are two (i.e., bottom and top) priming/coating layers. Berger Textiles has not demonstrated that the producer does not apply CBM's priming/coating layer for graphical purposes or that the priming/coating layer does not increase the canvas' receptivity to paint, ink, or other artistic materials. Commerce asked Berger Textiles, "whether the coating increases receptivity to any artist materials…." In response, Berger Textiles only stated that "top coat in {sic} receptivity is not a requirement of the *Order*. In terms of {the} 'promoting the adherence' requirement…the bottom priming/coating does not 'promote the adherence' of the inks."

Berger Textiles thus failed to provide a factual response to Commerce regarding the qualities of the top coat's ink receptivity. Nor did Berger Textiles address Commerce's inquiry "whether CBM is primarily used for the application of print or artistic materials" or "whether CBM's priming/coating layer aids the receptivity of latex, UV, and solvent inks application of print or artistic materials." Due to this lack of responsiveness, Commerce found "Berger Textiles has not demonstrated that the producer does not apply CBM's priming/coating layer for graphical purposes or that the priming/coating layer does not increase the canvas' receptivity to paint, ink, or other artistic materials."

## C.    The Scope Language Explicitly Describes CBM

As directed by 19 C.F.R. § 351.225(k)(1)(i), the starting point in determining the scope of an order is the scope language it contains. The antidumping duty order on Artist Canvas from China, as amended, has the following coverage:

The products covered by this order are artist canvases regardless of dimension and/or size, whether assembled or unassembled, that have been primed/coated, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat. Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric. Artist canvases (i.e., prestretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placemats) are tightly woven prepared painting and/or printing surfaces. Artist canvas and stretcher strips (whether or not made of wood and whether or not assembled) included within a kit or set are covered by this proceeding.

Artist canvases subject to this order are currently classifiable under subheadings 5901.90.20.00, 5901.90.40.00, 5903.90.2500, 5903.90.2000, 5903.90.1000, 5907 .00.8090, 5907.00.8010, and 5907 .00.6000 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Specifically excluded from the scope of this order are tracing cloths, "paint by number" or "paint-it-yourself" artist canvases with a copyrighted preprinted outline, pattern, or design, whether or not included in a painting set or kit.[5] Also excluded are stretcher strips, whether or not made from wood, so long as they are not incorporated into artist canvases or sold as part of an artist canvas kit or set. While the HTS US subheadings are provided for convenience and customs purposes, our written description of the scope of this proceeding is dispositive.

Additionally, we have determined that canvas woven and primed in India, *Sunset Review of the Antidumping Duty Order.* 82 FR 8723 January 30. 2017). *See Notice of Scope Rulings.* 75 FR 14138 (March 24, 2010).

[5].Artist canvases with a non-copyrighted preprinted outline, pattern, or design are included in the scope, whether or not included in a painting set or kit.

*Certain Artist Canvas from the People's Republic of China: Continuation of the Antidumping Duty Order*, 82 Fed. Reg. 14,502 (March 21, 2017).

Of particular relevance to this case, the covered articles are defined as "artist canvases . . . that have been primed/coated, whether or not made from cotton, whether or not archival, . . . and whether or not containing an ink receptive top coat. Priming/coaling includes the application of a solution, designed to promote the adherence of artist materials, such as paint

or ink, to the fabric. Artist canvases (i.e., . . . printable canvases . . .) are tightly woven prepared painting and/or printing surfaces."

The language is explicit and unambiguous. Covered products are defined as primed/coated canvases, with or without an ink-receptive topcoat. Priming/coating includes application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric. The order characterizes covered products as "tightly woven prepared painting and/or printing surfaces" and lists common forms of them.

This description presents a straightforward and objectively verifiable standard to identify in-scope merchandise: (1) is the product a primed/coated canvas (2) to which has been applied a solution designed to promote the adherence of artist materials, such as paint or ink, to the canvas fabric (3) resulting in a tightly woven prepared painting and/or printing surface. Products meeting these criteria are covered.

Berger Textiles' own scope request establishes that CBM precisely meets the criteria for coverage. It is made of polyester fabric of "600 denier 100% polyester fabric woven (i.e., warp and weft) filament fiber" that has been coated for use as printing media. This identifies it as a canvas product which has "been primed/coated, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat." CBM is a tightly woven prepared printing surface which enters the United States as "rolls of various lengths with no designs", with the fabric being "600 denier 100% polyester fabric woven (i.e., warp and weft) filament fiber." CBM Scope Request at 3-4. CBM thus qualifies as coated canvas, with the coating used on it to provide ink transfer properties. The Order covers exactly such a product.

It is well-established that "The plain language of a countervailing or antidumping order is 'paramount' in determining whether particular products are included within its

scope." *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014), citing *King Supply Co. v. United States,* 674 F.3d 1343, 1345 (Fed. Cir. 2012). The plain language of the Order on Artist Canvas unambiguously describes Berger Textiles' CBM.

The production process, which (according to Berger Textiles) requires application of "multiple coatings to the polyester", likewise squares exactly with the Order's language: it involves application of "multiple coatings to the polyester" to permit ink, one of the specifically-identified "artist materials", to adhere.

The marketing materials quoted above also establish CBM as printing canvas. The data sheet identifies the product's "Applications" as including "art reproduction", "stretched canvas" "Topseller! Matt economy canvas for art reproduction, roll-ups, banners etc. /" "Important for Latex-print: glossy print with high color brilliance, water- & scratch-resistance better than with 4446-56." Having described its product as usable for these purposes, Berger Textiles cannot now plausibly claim it either does not know its applications or that printing is not among them. CBM Scope Request, Attachment 10.

The Product Data document likewise describes the applications as including "canvas frames / art reproduction" and includes a graphic stating "Certified for HP Latex Inks." If CBM were not print canvas this statement would be superfluous.

There is no question, either, that the product is coated, although the number of coats applied is uncertain. The ruling request describes CBM as fabric "that has been coated with polyvinyl acetate / acrylate type polymers." The Customs and Border Protection laboratory report states "The sample is woven and coated on one surface."

The description in United States Patent 5,853,899 further corroborates that CBM's coating is intended for printer ink receptivity.[1] The products it describes consist of a "receiving medium comprising a substrate and an ink receiving layer." That statement categorically establishes those products as artist canvas fitting the scope description. To use the specific scope language, it is "primed/coated", meaning that it underwent "the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." The invention described in the patent performs this task, in that it has an "ink receiving layer", and results in "tightly woven prepared painting and/or printing surfaces."

It is noteworthy that Berger Textiles did not address the preceding descriptive language, or otherwise attempt to demonstrate why the descriptive language is inapplicable to its products. It never denied that its products consist of canvas which has been coated with a chemical solution so that images may be printed on them; to the contrary, its own information establishes this fact.

**D.      CBM Is Coated with an Ink Receptive Solution within the Order's Coverage**

Instead of addressing the scope language, Berger Textiles' apparent argument is that CBM falls outside the order's scope because the first chemical coating applied to it supposedly does not promote adherence of ink. Leaving aside that the scope request did not identify any coatings for CBM other than those identified in U.S. Patent 5,853,899, the argument simply ignores the scope's coverage of "artist canvases . . . that have been primed/coated . . . Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." Covered products may be primed with "a solution, designed to promote the adherence of artist materials," coated with

---

[1]      Berger Textiles identified the patent as "CBM's technology", CBM Scope Request at 6, indicating that the process description in the patent describes the method used to produce CBM. The Scope Request never addressed the fundamental contradiction between the patent's coverage of "a substrate and an ink receiving layer" and Berger Textiles' position that the chemical solution on CBM does not promote adherence of ink.

such a solution, or both. The use of the "/" symbol between the words "primed" and "coated" indicates the words are used in the disjunctive. See, e.g., https://www.grammarly.com/blog/slash/ (last visited April 24, 2024).[2]

It suffices for coverage that a fabric is coated with "a solution, designed to promote the adherence of artist materials." CBM is so coated. The scope language does not require it to be primed with such a solution and Berger Textiles points to no textual support for such a requirement.

Berger Textiles asserts that "the reference 'designed to promote the adherence of artist materials" in the scope language compels a narrow interpretation of the words "priming/coating.'" Pl. Br. 11. Next, it claims "Commerce stated that Berger's CBM is within the scope of the *Order* because the 'CBM is a canvas roll and/or printable canvas that is primed/coated and is a woven ***prepared painting and/or printing surface*** ... that the primed/coated side of the fabric ***is receptive to artist materials, consistent with our prior scope rulings*** . . . Clearly Commerce shifts the language away (unlawfully *expands* the Oder) from the language of the Order and that of the intent of the Tara." p12 (emphasis added by Berger Textiles.) The argument concludes by claiming the scope language is ambiguous.

To accept Berger Textiles' argument would require rewriting the order's description as well as ignoring CBM's physical attributes. Berger Textiles' brief nowhere explicates what it means by "a narrow interpretation of the words "priming/coating."" This distinction is neither stated nor implied in the scope's text. A fabric is either primed/coated or it is not. CBM is

---

[2]    The cited reference states:

Often, when a slash is used in a formal or informal text, it is meant to indicate the word *or*. The examples below illustrate this meaning of the forward slash:

| | |
|---|---|
| Example | When leaving the classroom, the teacher noticed that a student had left his/her backpack. |
| Example | College freshmen should bring a mattress and/or cot to sleep on during orientation. |
| Example | If/when Mary ever shows up, we can all head out to the party together. |
| Example | Burgers or pizza for dinner? Yeah, either/or is fine with me. |

coated, which Berger Textiles acknowledged in its scope request letter to Commerce. As described in the patent which established the technology for CBM's production, the product includes "a substrate and an ink receiving layer." Berger Textiles' product is, therefore, coated with a "solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric."

**E.     The CBM Scope Ruling Is Supported by Substantial Evidence**

Berger Textiles' brief glosses over the fact that Commerce sought additional information regarding CBM's properties from the company but did not receive a straight answer. As explained in the CBM Scope Ruling:

> Commerce asked Berger Textiles, "whether the coating increases receptivity to any artist materials…." In response, Berger Textiles only stated that "top coat in {sic} receptivity is not a requirement of the Order. In terms of {the} 'promoting the adherence' requirement…the bottom priming/coating does not 'promote the adherence' of the inks."
> * * *
> The record, therefore, contains several instances in which Berger Textiles declines to affirmatively state that CBM lacks a priming/coating layer that is applied for graphical purposes and instead focuses exclusively on the adherence of the "bottom" priming/coating layer.

Scope Ruling at 17.  The agency provided Berger Textiles with every opportunity to explain the attributes of CBM's coating. Berger Textiles refused to provide a factual answer. Commerce thereupon concluded "Berger Textiles has not demonstrated that the producer does not apply CBM's priming/coating layer for graphical purposes or that the priming/coating layer does not increase the canvas' receptivity to paint, ink, or other artistic materials." In light of its deliberate failure to cooperate with Commerce's inquiries, Berger Textiles cannot now be heard to challenge the agency's findings regarding CBM's attributes and uses or the properties imparted to it by the coating.

It is noteworthy that the Commerce analysis does not rely solely on Berger Textiles' non-cooperation to inform its analysis. The CBM Scope Ruling notes:

that CBM is marketed for art reproduction and that art reproduction is a "{w}idely, publicly known use{}" of CBM. In fact, the record contains evidence that CBM has a priming/coating layer that increases the canvas' receptivity to artist materials. Specifically, Berger Textiles submitted a patent for "CBM technology," which described "a receiving medium comprising a substrate and an ink receiving layer." The patent states that an "ink receptive coating" is "applied to a substrate such as…canvas," creating a medium "which yields a U.V. and water resistant ink jet print.

* * *

Moreover, the expert report that Berger Textiles relies on to show that the bottom priming/coating does not promote adhesion assumes an overly narrow definition of adhesion, and is at times conflicting because the expert also concludes that the bottom priming/coating layer contributes "slightly to absorption of ink," which is an artist material identified in the scope.  Furthermore, as discussed above, Berger Textiles fails to distinguish CBM's potential uses, including "art reproduction," "wall covering," and "décor applications," from artist canvas.

CBM Scope Ruling at 17, 18.

Addressing the fundamental factual issue raised in the scope proceeding, Commerce has thus determined that CBM does qualify as print canvas. It explained its analysis and conclusion with reference to the record evidence. The CBM Scope Ruling accordingly satisfies the substantial evidence standard, in that it presents "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *Huaiyin Foreign Trade Corp. v. United States,* 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))", quoted in *Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014).

Berger Textiles' brief merely states that "Commerce is again simply incorrect in terms of interpreting the scope language of the *Order* in terms of the CBM Scope Request. The facts are consistent that CBM's priming/coating does not 'promote the adherence of artist materials' and does not concern 'receptivity'. Berger has shown through its testing and third-party experts that CBM has a priming/coating and a top coating, neither of which 'promote[s] the adherence of artist materials'". Merely stating that "Commerce is . . . incorrect" is woefully insufficient under the substantial evidence standard. Commerce made point by point, record-

based findings regarding CBM's attributes. Berger Textiles has shown no deficiencies in those findings.

Not only does Berger Textiles fail to demonstrate these findings are incorrect, it fails to address them at all. In particular, its claim to have shown that CBM's topcoat does not "promote the adherence of artist materials" is inconsistent with its refusal to respond to Commerce's factual questions on this very point. Having explicitly declined to tell Commerce "whether the coating increases receptivity to any artist materials," Berger Textiles cannot now credibly assert that it does not. The opportunity to do so was presented during the Commerce administrative proceedings, and is now foreclosed.

Instead of responding to this highly relevant question posed by Commerce, Berger Textiles asserted during the administrative proceedings that an ink-receptive top coat "is not a requirement of the *Order*." While it is unclear whether it maintains this position before the Court, Ecker Textiles notes that the assertion is contrary to the Order's terminology covering canvases "whether or not containing an ink receptive top coat." Products having an ink receptive top coat categorically are covered. Commerce reasonably determined that CBM does have such a top coat. The "whether or not" wording indicates that not all articles covered by the order have an ink receptive top coat, but those that do are subject merchandise.

Berger Textiles seemingly invites the Court to reweigh Commerce's fact findings about CBM, an invitation which the Court is precluded from accepting. *Usinor v. United States,* 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted). In doing so, it ignores the substantial evidence standard and fails to address the above-quoted fact discussion in the ruling. While it provides pages of case citations, it does not apply the substantial evidence criteria discussed in those cases to the facts at hand in this litigation. Instead, in place of analysis, its brief repetitively intones that the ruling is unsupported by

substantial evidence. For the Court to overturn Commerce's fact findings requires much more than this, however. Commerce clearly and extensively laid out the grounds for its conclusion that CBM's qualities qualify it as artist canvas within the order's coverage.

Berger Textiles has shown no error in Commerce's analysis. In fact, it simply ignores its own descriptions of CBM's uses as "art reproduction," "stretched canvas," "Important for Latex-print: glossy print with high color brilliance, water- & scratch-resistance better than with 4446-56/" It ignores the patent's claimed coverage for "1. An ink jet receiving medium having an ink receptive coating on a substrate with the coating being comprised of a blend of an ethylene vinylacetate copolymer and a fully hydrolyzed polyvinyl alcohol." The reference to a "receiving medium" belies Berger Textiles' claim before this Court that "CBM's priming/coating does not 'promote the adherence of artist materials' and does not concern 'receptivity'". To the contrary, claims 1 through 8 of the patent all relate the ink jet receiving mechanism. Berger Textiles' representation otherwise is contrary to the facts of record.

Moreover, claim 7 of the patent describes "[a] process for providing a water resistant ink jet print comprising attaching droplets of an aqueous recording ink containing a water soluble dye to a receiving medium comprising an ink receiving layer provided on a substrate, the ink receiving layer comprising a blend of ethylene vinylacetate copolymer and a fully hydrolyzed polyvinyl alcohol." The process of "attaching droplets of an aqueous recording ink . . . to a receiving medium comprising an ink receiving layer provided on a substrate" precisely fits the scope provision for "Priming/coating [which] includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." By causing ink droplets to attach to the medium, the process makes them adhere.

Here, too, Berger Textiles' statement to this Court that "'CBM's priming/coating does not 'promote the adherence of artist materials'" is demonstrably at odds with the facts. There

is no acknowledgement of the patent's claims, notwithstanding Berger Textiles' statement that CBM is produced in accordance therewith, much less any attempt to reconcile these inconsistencies.

The patent's claims also raise a fundamental question about CBM's production process and the number and type of coatings applied to the product. The patent refers to "an ink receptive coating on a substrate with the coating being comprised of a blend of an ethylene vinylacetate copolymer and a fully hydrolyzed polyvinyl alcohol." This description comports with Berger Textiles' own description of the product as "polyester fabric woven (i.e., warp and weft) filament fiber, weighing approximately 270 GSM, that has been coated with polyvinyl acetate / acrylate type polymers." The CBM Scope Request at page 5 refers to the same components, including "polyvinyl acetate / acrylate type polymers." These line up with the chemicals identified in the patent ("ethylene vinylacetate copolymer and a fully hydrolyzed polyvinyl alcohol.") However, Berger Textiles also states that "The process consists of applying multiple coatings to the polyester" but provided no further explanation; indeed, as discussed above, it refused to respond to Commerce's questions regarding the top coat's existence or properties. This obfuscation led Commerce to remark that "the patent indicates that the substrate has only one priming/coating layer (*i.e.*, the ink receptive coating), notwithstanding Berger Textile's assertion that there are two (*i.e.*, bottom and top) priming/coating layers." CBM Scope Ruling at 17.

No other coating materials are mentioned in the scope request. Consequently, regardless of whether there is a single coating or more than one, all the chemicals identified in the administrative record as used in CBM's production fall within the patent's claim for "an ink jet receiving medium."

17

Berger Textiles now asserts (without having provided any supporting details to Commerce during the administrative proceeding) that "CBM has a priming/coating and a top coating." Even assuming this statement is accurate, what it glosses over is that both coatings apparently have the same composition. The distinction Berger Textiles seeks to draw between top and bottom coatings is, therefore, meaningless as a factual matter, just as it has no bearing on whether CBM has "been primed/coated" with "a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric." As long as the fabric is coated with such a solution it is within the order's coverage.

The CBM Scope Request is further flawed because it provided internally contradictory descriptions of the product's characteristics and uses. Berger Textiles' own descriptions, quoted above, asserted it is a coated canvas intended for and usable in printing, and is marketed as such. On the other hand, the document dwelled extensively on two laboratory analyses purporting to demonstrate that CBM has inferior ink adherence properties.

There was no attempt in the Scope Request to rectify the inconsistency in marketing the product as a medium for printing, and deprecating its practical use for that application for Commerce Department scope purposes. Nor did Berger Textiles explain what use, if any, CBM has besides as a printing medium.

19 C.F.R. §§ 351.225(c)(2)(i) requires that a scope ruling request provide the following information:

A detailed description of the product and its uses, as necessary:

(A) The physical characteristics (including chemical, dimensional, and technical characteristics) of the product;

* * *

(D) The uses of the product;

Berger Textiles presented two inconsistent versions of CBM's characteristics and uses. While the request seemed to argue that inferior ink adherence properties somehow remove the

product from scope coverage, it ignored Berger Textiles' own description of CBM as usable for printing. Its argument appears to be that CBM should be excluded because it is a poorly-made print canvas. The order, however, does not provide for an inferior product exclusion, and Berger Textiles points to no authority for this premise. As Commerce noted, "while Berger Textiles impugns CBM's ability to produce quality art reproduction, the product's quality does not determine whether it is subject to the *Order*." CBM Scope Ruling at 15-16.

**F.    The Scope Does Not Require that Imported Artist Canvas Be Made with the Same Materials and Processes as those of the Domestic Industry**

Next, Berger Textiles asserts that purported differences between its product and those produced by Ecker Textiles (and the original petitioner, Tara Materials, Inc.) warrant the former's exclusion. Whatever differences there may be in the materials used for coating Ecker Textiles' products and CBM are irrelevant to the Order's applicability. Its language applies to all products meeting the specified criteria, *i.e.*, fabric that has been primed/coated with an "application of a solution, designed to promote the adherence of artist materials, such as . . . ink, to the fabric." There is no mention in the order of the solution's composition.

Berger Textiles would, instead, have the Court adopt a requirement that merchandise be made of identical materials, and with the identical processes, as those for Ecker Textiles' products, to qualify as subject merchandise. Such a purported requirement appears nowhere in the order; to the contrary, the scope language describes all "tightly woven prepared painting and/or printing surfaces" meeting its terms. As long as the canvas is primed with a solution which promotes adherence of artist materials (in this case, ink), it is covered. Berger Textiles' Scope Request has established that CBM meets this criterion.

Berger Textiles quoted Tara Materials' descriptions of its own production process at the time of the original investigation. It did not, however, even attempt to argue how and why those descriptions would in any way limit the descriptive language in the order. It is, of

19

course, that language which determines the scope. CBM's qualities must be evaluated against the language in the Order, not by reference to the processes used by Ecker Textiles or tara Materials.

Berger Textiles attempts to distinguish its products because they "contain{} no acrylic 'gesso' priming/coating that 'promote{s} the adherence of artist materials.'" Whether or not Berger Textiles calls its coating gesso or something else is immaterial for scope evaluation purposes. The word "gesso" appears nowhere in the scope language, making Berger Textiles' argument that its products are excluded because they are not made with "gesso" completely beside the point. By the same token, the use of acrylic as a coating material by Ecker Textiles, and not by Berger Textiles, is irrelevant. The word "acrylic" appears nowhere in the Order as an inclusionary factor. A polyvinyl acetate/acrylate type polymer-based coating is just as much a "solution, designed to promote the adherence of artist materials" within the Order's coverage as any other ink-receptive coating, with or without acrylic as a material. Berger Textiles has simply ignored that there is no exclusionary language for canvas coated with the chemicals it uses.

More substantively, Berger Textiles shows a misunderstanding of both the Order's coverage and the nature of its own product when it claimed that "CBM does not 'promote the adherence of artist materials," CBM Scope Request at 17. This misstatement stems from a flawed reading of the Order's language. The argument appears to be premised on the faulty notion that in-scope products must have a paint-receptive first coating, so that the artist materials whose adherence they promote are limited to paint.

The Order states otherwise. Its use of the phrase "such as paint or ink" following "adherence of artist materials" means that ink is an artist material just as paint is. Coating canvas with a solution for adherence of ink is, therefore, no different than doing so for

adherence of paint for scope coverage purposes. Each one is explicitly described by the Order's language.

As demonstrated above, the coating on CBM is "designed to promote the adherence of" ink. Those products have, therefore, undergone the "priming/coating" required for coverage by the Order.

Commerce dispensed with Berger Textiles' position by explaining that the term "gesso" had been used in previous rulings synonymously with "priming/coating."  It was not a term of limitation but instead a shorthand reference to the various priming/coating solutions that manufacturers of artist canvas use to "promote the adherence of artist materials, such as paint or ink, to the fabric." CBM Scope Ruling at 16. Commerce's explanation comports with the scope language. As the agency recognized, the word "gesso" is not used in the order. Instead, it has been used as a general reference to the "priming/coating" solution which characterizes merchandise within the order's coverage.

Berger Textiles also sought to differentiate the chemical coating applied to its products from the type of priming solution referred to in the order. Nevertheless, its own submission establishes the coating used on its products as "a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric".

Next, Berger Textiles identifies purported differences between the coating used by Ecker Textiles and that for CBM:

> The patent also reinforces the differences between Tara's acrylic gesso from the patent where the receiving medium (i.e., priming/coating) is meant for yielding "a U.V. and water resistant ink jet print", something that Tara never mentioned throughout it process with the *Order* and its print canvas scope ruling. Moreover, Tara never mentioned ethylene-vinyl acetate (EVA). Instead, it continually focused on its "specific" acrylic "gesso" bottom "adherence" priming/coating formula, characteristics, and advantages.

*Id*. at 6. Whatever differences there may be in the materials used for coating Ecker Textiles' products and CBM are irrelevant to the Order's applicability. Its language applies to all

products meeting the specified criteria, *i.e.*, fabric that has been primed/coated with the "application of a solution, designed to promote the adherence of artist materials, such as . . . ink, to the fabric." There is no mention in the order of the solution's composition.

**G.    Conclusion**

For all the foregoing reasons, defendant-intervenor Ecker Textiles requests that this Court determine that the Commerce Department's Final Scope Ruling on the Antidumping Duty Order on Certain Artist Canvas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse (Aug. 15, 2023) is supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/    George W. Thompson

George W. Thompson
Thompson & Associates, PLLC
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Telephone: 202-772-2039

Dated: April 25, 2024

22

**CERTIFICATE OF COMPLIANCE**

Pursuant to Standard Chambers Procedure 2(B), the undersigned certifies that this brief complies with the word limitation requirement. The word count for defendant-intervenor Ecker Textiles. LLC's Response Brief to Plaintiff's Rule 56.2 Motion, as computed by Thompson & Associates' word processing system, is 7,024 words, less than the 14,000 word limit set by the Standard Chambers Procedures..

/s/   George W. Thompson

Dated: April 25, 2024

```
_____ x
                                         :
PRINTING TEXTILES, LLC                   :
DBA BERGER TEXTILES                      :
                                         :
                    Plaintiff,           :                        :
                                         :   Court No. 23-00192
              v.                         :
                                         :
UNITED STATES                            :
                                         :
                    Defendant,           :
          and.                           :
                                         :
ECKER TEXTILES, LLC                      :
                                         :
              Defendant-Intervenor       :
_____ x
```

## ORDER

Upon reading the Motion for Judgment on the Agency Record of Plaintiff, Printing

Textiles, LLC dba Berger Textiles, and upon all other papers and proceedings herein, it is

hereby –

ORDERED, that the Motion is denied, and it is further—

ORDERED, that this action is dismissed.

SO ORDERED.


_____
Timothy C. Stanceau, Senior Judge


Dated: _____
New York, New York

1