NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**PRINTING TEXTILES, LLC, DBA BERGER TEXTILES,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, ECKER TEXTILES, LLC,**
*Defendants-Appellees*

---

2025-1213

---

Appeal from the United States Court of International Trade in No. 1:23-cv-00192-TCS, Senior Judge Timothy C. Stanceu.

---

Decided: August 26, 2026

---

KEREM BILGE, Thompson Hine LLP, Washington, DC, argued for plaintiff-appellant.

BLAKE WILLIAM COWMAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by PATRICIA M. MCCARTHY, BRETT SHUMATE, FRANKLIN E. WHITE, JR.; JUSTIN REINHART MILLER, New York, NY; FEE PAUWELS,

BRIEN STONEBREAKER, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

GEORGE THOMPSON, Thompson & Associates, PLLC, Washington, DC, argued for defendant-appellee Ecker Textiles, LLC.

---

Before MOORE, *Chief Judge*, STOLL, *Circuit Judge*, and MOORE, *District Judge*.[1]

MOORE, *District Judge*.

Printing Textiles, LLC d/b/a Berger Textiles ("Berger") appeals from a final judgment of the U.S. Court of International Trade ("CIT") issued on October 8, 2024, which sustained a determination made by the U.S. Department of Commerce ("Commerce") that Canvas Banner Matisse ("CBM"), which Berger imports, are within the scope of an antidumping duty order, *Notice of Antidumping Duty Order: Certain Artist Canvas from the People's Republic of China*, 71 Fed. Reg. 31,154 (June 1, 2006) ("*Order*"). Berger submitted an Application of Scope Ruling ("Scope Request") pursuant to 19 C.F.R. § 351.225(c) on December 15, 2022. Following a 19 C.F.R. § 351.225 proceeding ("Scope Inquiry"), on August 15, 2023, Commerce issued its Final Scope Ruling on the Antidumping Duty Order on Certain Artist Cavas from the People's Republic of China: Berger Textiles' Canvas Banner Matisse ("Final Scope Ruling"). Berger timely appealed the Final Scope Ruling. The CIT then sustained the same, from which judgment Berger timely appealed. We now *affirm*.

---

[1] Honorable K. Michael Moore, District Judge, United States District Court for the Southern District of Florida, sitting by designation.

## BACKGROUND

On June 1, 2006, Commerce published the *Order* which defined the scope, in relevant part, as follows:

> The products covered by this order are artist canvases regardless of dimension and/or size, whether assembled or unassembled, that have been primed/coated, whether or not made from cotton, whether or not archival, whether bleached or unbleached, and whether or not containing an ink receptive top coat. Priming/coating includes the application of a solution, designed to promote the adherence of artist materials, such as paint or ink, to the fabric. Artist canvases (i.e., pre–stretched canvases, canvas panels, canvas pads, canvas rolls (including bulk rolls that have been primed), printable canvases, floor cloths, and placemats) are tightly woven prepared painting and/or printing surfaces. Artist canvas and stretcher strips (whether or not made of wood and whether or not assembled) included within a kit or set are covered by this proceeding.

*Order*, 71 Fed. Reg. at 31,155. Berger's CBM is 600 denier 100% polyester fabric woven filament fiber, coated on one side with polyvinyl acetate/acrylate-type polymers. The coating is visible to the naked eye and contains hydrophobic sealing and fireproof agents, and Berger takes the position that this "bottom priming/coating does not promote the adherence of artistic materials." *See, e.g.*, J.A. 39.[2] CBM is imported as fabric rolls with no design. *Id.* Berger listed CBM's uses as including "canvas (art reproduc-

---

[2] Citations to "J.A." refer to the Third Corrected Nonconfidential Joint Appendix filed by the Parties, Dkt. No. 38.

tion/stretched), roll-up display system, banner product, display x-kite system, wall covering, décor applications, and tenting." *Id.*

In the Scope Request, Berger sought a determination that Commerce unlawfully expanded the scope of the *Order*, that the *Order* was void-for-vagueness and unconstitutional, and that in any event CBM did not fall within the scope of the *Order* because the type of coating on the CBM is distinguishable. Berger sought to distinguish between the canvas products created by Tara Materials, Inc. ("Tara"),[3] which feature an acrylic latex "gesso" coating that promotes "adherence" to artist materials, and its own polyvinyl-acetate/acrylate-type polymers, focusing on the fact that Tara never mentioned priming/coating that was of a different formula from the "gesso" coating. J.A. 41. According to Berger, underlying all of its challenges to the *Order* is that Commerce seeks to expand the scope language of "designed to promote the adherence of artist materials" to include broader terms such as coatings that are designed to be "receptive to" or "allow for acceptance of" artist materials. Berger thus argued that because CBM's priming/coating is not designed to promote the adherence of artistic materials and is not an acrylic latex "gesso" material, Commerce incorrectly concluded that the product was within the scope of the *Order*.

After initiating the Scope Inquiry on January 18, 2023, Commerce received comments from Charta Group, Inc. d/b/a Permalite, Inc. and Appellee Ecker arguing that CBM

---

[3] Tara was the petitioner in the underlying antidumping investigation. Appellee Ecker Textiles, LLC ("Ecker") then purchased Tara, including its artist canvas production assets, after the investigation and is the successor-in-interest to Tara. J.A. 38. The Parties refer to Tara and Ecker sometimes interchangeably when discussing the proceedings prior to the instant appeal.

is properly within the *Order*'s scope, and Berger responded to those comments. Commerce then issued the Final Scope Ruling, determining that, upon application of a 19 C.F.R. § 351.225(k)(1) ("(k)(1)") analysis, CBM fell within the scope of the *Order* and because the (k)(1) analysis was dispositive, it need not reach the 19 C.F.R. § 351.225(k)(2) ("(k)(2)") analysis. J.A. 458–78. The Final Scope Ruling addressed the scope of the *Order* and the characteristics of CBM before reviewing previous scope rulings relevant to the *Order* and the various comments received. Commerce specifically rejected Berger's arguments above in finding that "CBM is a canvas roll and/or printable canvas that is primed/coated and is a woven prepared painting and/or printing surface" and that the "primed/coated side of the fabric is receptive to artist materials, consistent with our prior scope rulings" and therefore that "CBM is subject to the *Order*." J.A. 472.

Berger timely challenged the Final Scope Ruling before the CIT, arguing that (1) Commerce's determination was not supported by substantial evidence and was contrary to law because CBM does not have a priming/coating layer within the meaning of the *Order*, and (2) Commerce misapplied the (k)(1) and (k)(2) factors, incorrectly interpreted the scope language, and unlawfully expanded the scope of the *Order*. The CIT sustained the Final Scope Ruling on October 8, 2024, finding that Commerce's interpretation of the priming/coating language as applied to Berger was not *per se* unreasonable, the (k)(1) and (k)(2) analysis was properly applied, that there was substantial evidence supporting Commerce's finding as to CBM, and that based on the foregoing, the Final Scope Ruling was not unreasonable, arbitrary, or capricious. The CIT further found that the *Order* was not void-for-vagueness or lacking in due process as applied to Berger because there was adequate notice based on the text of the *Order*. J.A. 3–23.

Following the CIT's entry of final judgment, Berger timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review decisions of the CIT "de novo, applying anew the same standard used by the CIT." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (cleaned up and quoting *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008). We will overturn a CIT decision if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). This does not mean, however, that we will "ignore the informed opinion of the [CIT]." *Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1356 (Fed. Cir. 2010) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994)).

We also review de novo the plain meaning of an antidumping order, including as to the existence of any ambiguity. *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017). However, we review the factual question of whether a product falls within the unambiguous scope terms under a substantial evidence standard. *Id.* Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1381 (quotation omitted). In conducting this review, we are "limited to the record before Commerce in the particular proceeding at issue and include[] all evidence that supports and detracts from Commerce's conclusion." *Ad Hoc Shrimp Trade Action Comm.*, 802 F.3d at 1348 (citing *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009)). That "two inconsistent conclusions can be drawn from the evidence" does not necessarily preclude a finding of substantial evidence. *Id.* (citation omitted).

Berger renews its arguments from the prior proceedings that CBM should be distinguished from Tara's priming/coating formula because it is not an acrylic latex "gesso" bottom "adherence" formula, and that the phrase "designed to promote the adherence of artist materials" should require a narrow interpretation of the words "priming/coating." Appellant's Br. at 14. Berger had submitted test results to show that the CBM priming/coating does not promote the adherence of ink, but Commerce determined that its own prior scope rulings and the U.S. International Trade Commission ("ITC") did not interpret "adherence" so narrowly such that "promote the adherence" could not reasonably mean "allow for acceptance of," "improve the receptivity of canvas to," or "increase the canvas' receptivity to" under a (k)(1) analysis. J.A. 474–75. Berger contends that Commerce misapplied the (k)(1) sources in reaching this determination.

In making a scope determination, Commerce must conduct the following two-step inquiry:

> (1) In determining whether a product is covered by the scope of the order at issue, the Secretary will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive.
>
> > (i) The following primary interpretive sources may be taken into account under paragraph (k)(1) introductory text of this section, at the discretion of the Secretary:
> >
> > > (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue;

(B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;

(C) Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and

(D) Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

(ii) The Secretary may also consider secondary interpretive sources under paragraph (k)(1) introductory text of this section, such as any other determinations of the Secretary or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence. However, in the event of a conflict between these secondary interpretive sources and the primary interpretive sources under paragraph (k)(1)(i) of this section, the primary interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue.

(2) (i) If the Secretary determines that the sources under paragraph (k)(1) of this section are not dispositive, the Secretary will then further consider the following factors:

> (A) The physical characteristics (including chemical, dimensional, and technical characteristics) of the product;
>
> (B) The expectations of the ultimate users;
>
> (C) The ultimate use of the product;
>
> (D) The channels of trade in which the product is sold; and
>
> (E) The manner in which the product is advertised and displayed.
>
> (ii) In the event of a conflict between the factors under paragraph (k)(2)(i) of this section, paragraph (k)(2)(i)(A) will normally be allotted greater weight than the other factors.

19 C.F.R. § 351.225(k)(1)–(2).

Berger contends that Commerce misapplied the (k)(1) analysis in reaching its determination, and that the CIT made the same error in its review. In what Berger characterizes as "scope creep," Commerce considered the ITC's past interpretations and its own prior scope rulings as "primary interpretive sources" under a (k)(1) analysis, which the CIT affirmed but Berger argues is erroneous as to both sources. J.A. 15. At bottom, Berger argues that the scope of the *Order* requires "Tara's specific acrylic latex 'gesso' bottom 'adherence' priming/coating formula," and that any interpretation of priming or coating that departs from that makes the scope language improperly indefinite, creates vague and open-ended interpretations, and unreasonably renders the following language surplusage: "[p]riming/coating includes the application of a solution, designed to promote the adherence of artist materials." Appellant's Br. at 14, 29–32, 44. We disagree.

Where a (k)(1) analysis is dispositive Commerce need not move on to (k)(2), as it declined to do here after analyzing the scope language and finding that the (k)(1) sources

were dispositive as to whether CBM is within the *Order*'s scope. *See* 19 C.F.R. § 351.225(k)(2). Section (k)(1) requires Commerce to first consider the scope language, which may be the only source underlying its determination if the language is dispositive, and then at its discretion consider the primary sources enumerated in § 351.225(k)(1)(i). Commerce may further consider secondary interpretive sources such as, *inter alia*, other Commerce determinations, industry usage, dictionaries, and other relevant record evidence but in the event of a conflict, the primary interpretive sources will "normally govern" in the scope determination. 19 C.F.R. § 351.225(k)(1)(ii). Consideration of these secondary sources does not move Commerce's analysis from (k)(1) to (k)(2), as both primary and secondary interpretive sources are properly considered under (k)(1). It is only if the aforementioned sources are collectively not dispositive that Commerce then must turn to (k)(2).

Here, in line with the foregoing sequencing, Commerce began with the scope language of the *Order* and pointed to Berger's own record evidence that CBM is "primed/coated for the purpose of converting a fabric into a canvas" in determining that priming/coating is required to stiffen and whiten the fabric. J.A. 38, 148–49, 471–72. In interpreting the "priming/coating" requirement, Commerce considered the ITC's interpretations as well as its own prior scope rulings including when it found Tara's print canvases to be within the scope of the *Order*, and compared out-of-scope merchandise from prior scope rulings with CBM. Consideration of all of these materials is squarely permitted under a (k)(1) analysis.

We are also unpersuaded that Commerce's decision lacks substantial evidence. There is no factual support for Berger's sweeping statement that "it is unequivocally clear that Tara's specific acrylic latex 'gesso' bottom 'adherence' priming/coating formula is a prerequisite to artist canvas under the *Order*." Appellant's Br. at 14, 44. As Commerce noted there is no mention of "gesso" in the scope language.

J.A. 473. Berger also argues that Commerce ignored Tara's intent and evidentiary submissions in the underlying investigation. While Tara's submissions were not each exhaustively discussed, Commerce did note Tara's position on the "processes and materials" that foreign producers use to make print canvas in support of the finding that the priming/coating was not limited to a gesso formula. *Id.* Commerce also considered Berger's testing but found there is no requirement of the priming/coating being at the bottom or top of the canvas, and that the scope language did not support Berger's proffered limitation where the *Order* states that priming/coating "*includes* the application of a solution, designed to promote the adherence of artist materials." J.A. 471, 474–75 (emphasis added).

The CIT found that this sentence could introduce ambiguity or is otherwise susceptible to multiple interpretations, but that this ambiguity was resolved by Commerce in applying the (k)(1) analysis to determine that other interpretive sources do not support a limitation of priming/coating that is specifically "designed to promote the adherence of artist materials." We disagree with Berger that the use of "including" rather than "including, but not limited to," which is language that Commerce has used in separate scope rulings but not in the Final Scope Ruling here, would compel a contrary conclusion. Berger's invocation of the *expressio unius* cannon of statutory interpretation, which contemplates usage of particular language in different parts of one statute, does not save its argument here. Moreover, Commerce applied a broader definition that encompasses allowing for acceptance and improving or increasing receptivity to, instead of a narrow definition of promoting adherence, such that this dispute over the term "including" is ultimately immaterial. Indeed, Berger's own expert found that CBM's priming/coating contributes "slightly to absorption of ink." J.A. 475. Berger's other arguments that Commerce failed to consider its arguments or evidence are belied by the record.

We afford "'significant deference to Commerce's interpretation of a scope order,' so long as Commerce's interpretation is not 'contrary to the order's terms' and does not 'change the scope of the order.'" *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300 (Fed. Cir. 2013) (quoting *Global Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013)). Ultimately, Commerce found that Berger "fails to demonstrate that [CBM's] coating was applied for non-graphical purposes or that it does not increase the underlying canvas' receptivity to paint, ink, or other materials," including because a distinction between a top layer and a bottom layer is not supported by the record or scope language, and Berger declined to affirmatively state that there was no such graphical purpose. J.A. 475–76. As set forth above, Commerce's Final Scope Ruling was supported by substantial evidence, reached upon a proper (k)(1) analysis, did not unlawfully expand the scope of the *Order*, and was not otherwise arbitrary or capricious as to its scope determination or determination that CBM fell therein.

## CONCLUSION

We have considered Berger's remaining arguments and find them unpersuasive. For the foregoing reasons, we *affirm* the CIT's judgment.

Costs to Appellees.

**AFFIRMED**